Irwin A. Bala, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

488

Argued June 5, 1978, before Judges WILKINSON, JR., MENCER and ROGERS, sitting as a panel of three. Reargued December 5, 1978, before President Judge BOWMAN and Judges CRUMLISH, JR., MENCER, ROGERS, BLATT, DISALLE and CRAIG. Judges WILKINSON, JR. and MACPHAIL did not participate.

*Richard P. Perna,* for petitioner.

*Daniel R. Schuckers,* Assistant Attorney General, with him *Susan Shinkman,* Assistant Attorney General, and *Robert P. Kane,* Attorney General, for respondent.

OPINION BY PRESIDENT JUDGE BOWMAN, May 8, 1979:

This case involves the denial of unemployment compensation benefits because of an employee's private communication to the employer's hotel guest concerning a nonbusiness related matter. At issue is whether the communication involved is protected speech under the First Amendment of the United States Constitution, rendering the denial of benefits unconstitutional as a violation of the First and Fourteenth Amendments, and, if not, whether the employee's conduct in sending the communication rose to willful misconduct justifying denial of unemployment compensation pursuant to Section 402(e) of the Unemployment Compensation Law (Law).[1]

The appellant, Irwin A. Bala, was last employed by the Benjamin Franklin Hotel (Hotel) as a Roundsman, a night watchman without a uniform or firearms, from June 29, 1975 until March 21, 1976. Although he had during this ten month period received periodic warning notices concerning his job performance, according to the testimony of the Hotel's personnel manager

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §802(e), which provides in pertinent part:

An employe shall be ineligible for compensation for any week—

. . . .

(e) In which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work. . . .

Bala was terminated as a result of an incident which occurred on his last day of work, March 21, 1976.[2]

This incident was precipitated by a visit to the Hotel by one John Geisman, the Pennsylvania Manager of Senator Fred Harris's Presidential campaign, a campaign toward which Bala had in the past evidenced some interest.

According to Bala's testimony before the referee, he arranged to meet Geisman in the hotel lobby prior to the start of his rounds on the night of March 21st. When Geisman did not appear he called up to his room and apparently was assured that Geisman would be right down. Geisman never appeared.

Feeling "angry" and "snubbed", Bala wrote a note on hotel stationery indicating his displeasure with the Harris campaign and suggesting he was going to work against Senator Harris in Pennsylvania.[3] On his normal rounds that evening he placed the note under the door of Geisman's room. Upon receipt of the note a complaint was lodged and Bala was discharged.

---

[2] Appellant was warned about such violations of Hotel policy as sleeping in a guest room while on duty, tardiness without proper notification, improper use of the telephone, annoying employees and interfering with the guests. The majority of these notices warned of dismissal in the event of reoccurrence.

[3] This handwritten note, reads as follows:

> Irwin Bala
> 520 So. 5th St.
> Phila., Pa. 19147
> 215-574-0327

Dear John,

Don't worry about anything, I don't mind being insulted. I was to go down to. Atlanta this comming [sic] week, to discuss Penna. strategy with the Carter people. My minister . . . convinced me to work with the Harris campaign instead. I guess that would be a mistake.

My qualifications aren't good anyway. I won the City Debating Championship in '49. Was on McCarthy's national staff in '68. My avocation is Campaign Politics.

Bala applied for unemployment compensation benefits, which application was turned down by the Bureau of Employment Security on the basis of Section 402(e). He appealed this determination, and after hearing before a referee, was again denied benefits. Bala appealed to the Unemployment Compensation Board of Review which affirmed the referee, and this appeal followed.

Appellant argues that his activity was protected speech under the First Amendment, and that the subsequent denial of unemployment benefits on account of his communication amounts to an impermissible infringement of his rights protected by the First and Fourteenth Amendments to the United States Constitution.

He argues further that his actions did not amount to willful misconduct under the law because his communication was personal in nature and not sufficiently work-related to support the conclusion that his actions amounted to an intentional disregard of the standards which his employer had a right to expect.

The Unemployment Compensation Board of Review (Board) counters that the note Bala delivered was of no public importance, was harmful to the Hotel's business, and was not protected by the First Amendment. Because he annoyed a guest with a disrespectful note, continues the Board, he should be considered discharged for willful misconduct and not entitled to unemployment compensation benefits.

---

Tell Harris to hoard his money for another State, he can truly kiss Pennsylvania goodbye.

Love,

Irv Bala

Mr. John Geesman [sic]
Room 1741—Campaign office
1393—sleeping room

This appeal is another instance of the continuing struggle to maintain a proper balance between individual rights and the increasing collectivism of modern society.[4] As government hegemony has proliferated within the context of an increasingly complex indus-

---

[4] Certainly the system of freedom of expression was designed specifically to engender a certain degree of societal conflict. History has proven, however, that there are numerous communications which may be regulated without offending the First Amendment.

At the outset a fundamental distinction must be made between interests that are individual or private in character and interests that are social or public. Such a distinction is . . . hard to draw with precision. Obviously, society must be concerned in some sense with all the interests of the individual; it is his welfare and achievements that make up the life of the community. Further, society must consider the relations between two or more individuals, and especially the reconciliation of conflicts between them; otherwise the solution of the controversy may disturb the public order or affect the general welfare adversely.

T. EMERSON, TOWARD A GENERAL THEORY OF THE FIRST AMENDMENT 66 (1963). Concern for the private interest has been evidenced most conspicuously in the area of defamation and protection of reputation. See, e.g., Cantrell v. Forest City Publishing Co., 419 U.S. 245 (1974) ; Gertz v. Welch, 418 U.S. 323 (1974) ; Time, Inc. v. Hill, 385 U.S. 374 (1967) ; New York Times Co. v. Sullivan, 376 U.S. 254 (1964). It has also arisen in the context of a right to privacy; see Kovacs v. Cooper, 336 U.S. 77 (1939) ; Olmstead v. United States, 277 U.S. 438 (1928) ; Warren and Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193 (1890) ; a right to fair administration of criminal justice and a fair trial; see Wood v. Georgia, 370 U.S. 375 (1962) ; Pennekamp v. Florida, 328 U.S. 331 (1946) ; and, most generically, a freedom of belief; see Cantwell v. Connecticut, 310 U.S. 296, 303 (1940) (freedom of belief "is absolute").

Of more relevance to the instant litigation are the myriad situations in which courts have been asked to resolve an apparent conflict between freedom of expression and a definable social interest. When the exercise of the right of expression has caused, or tended to cause, conduct which violated existing law, the Supreme Court has allowed restrictions on that expression in the interest of preserving internal order. Hence the distinction between "expression" and "conduct." Several broad categories of restrictions have been

trialized society, an inevitable tension has arisen between the system of freedom of expression emanating out of the First Amendment and the institutional concerns of government in organizing the relationship between individual and state. If there is to be learned but a single lesson from the developing decisional law

rationalized under the rubric of maintaining order: maintenance of national security, *Dennis v. United States*, 341 U.S. 494 (1951) (conviction of Communist Party members advocating violation of The Smith Act of 1940, 18 U.S.C. §2385); *Communist Party v. SACB*, 367 U.S. 1 (1961) (enforced registration); *Scales v. United States*, 367 U.S. 203 (1961) (conviction for advocating overthrow of the government); restricting "fighting words" and threats to local peace, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942):

> [I]t is well understood that the right to free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that *such utterances are no essential part of any exposition of ideas*, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. (Emphasis added.)

*Accord, Roth v. United States*, 354 U.S. 476 (1957) (obscenity); maintenance of local order and peaceful citizenry, *Hudgens v. NLRB*, 424 U.S. 507 (1976) (leafleting and handbilling); *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time"); *Cameron v. Johnson*, 390 U.S. 611 (1968) (access to courthouse); *Brown v. Louisiana*, 383 U.S. 131 (1966) (disruptive demonstration in library); *Cox v. Louisiana*, 379 U.S. 536 (1965) (public-issue picketing subject to regulation); *Thornhill v. Alabama*, 310 U.S. 88 (1940) (labor picketing protected unless violence likely); smooth operation of the political system, *Buckley v. Valeo*, 424 U.S. 1 (1976) (limitations on campaign expenditures); *Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548 (1973) (restricting political

on this subject it is that the static application of a perceived principle behind the Amendment grows increasingly difficult.[5]

---

activities of government employees) ; *United States v. Harriss,* 347 U.S. 612. (1954) (lobbying) ; ensuring administration of criminal justice, *Branzburg v. Hayes,* 408 U.S. 665 (1965) (grand jury investigations) ; and economic regulation, *Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U.S. 748 (1976) (limited measure of protection to commercial speech) ; *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375 (1970) (regulation of corporate proxy statements) ; *American Column & Lumber Co. v. United States,* 257 U.S. 377 (1921) (exchange of price and production information among competitors).

[5] Over the years the Supreme Court has adopted a variety of approaches in attempting to reconcile pressures upon what it perceived to be First Amendment Principle. At the time of the ratification of the Amendment controversy centered almost exclusively around the common law doctrine of prior restraint. *See* W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 151-52 (T. Cooley ed. 2d rev. ed. 1872) ("The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when punished"). *See also, Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 713-14 (1931).

The Court has most often been faced, however, with reconciling subsequent punishment, either criminal or civil, and the spectre of self-censorship. Certain expression may importune the commission of criminal conduct. At first the Court ruled that if Congress could punish the conduct, then it could punish the advocacy of that conduct. *Davis v. Beason,* 133 U.S. 333 (1890). Then, in *Schenck v. United States,* 249 U.S. 47, 52 (1919), Justice HOLMES formulated the "clear and present danger" test commonly considered the progenitor of First Amendment "tests." ("The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree."), *see also Terminiello v. City of Chicago,* 337 U.S. 1 (1949). Though the clear and present danger test retains a limited viability in the area of contempt of court, *see, In re Little,* 404 U.S. 553, 555 (1972), it essentially fell by the wayside in *Dennis v. United States,* 341 U.S. 494, 510 (1951), where the Court modified the old rule into a relative test wherein " '[courts] must ask whether the gravity of the "evil," discounted

We believe that it is somewhat simplistic to claim, as appellant does here, that his note to a presidential campaign manager, being "pure speech" is thereby necessarily entitled to First Amendment protection, to be comprised only in the event of a "compelling" state interest. *See Buckley v. Valeo,* 424 U.S. 1, 44-45 (1976) ("[T]he constitutionality . . . turns on whether the governmental interests advanced . . . satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression."); *Sherbert v. Verner,* 374 U.S. 398, 406 (1963); *Sweezy v. New Hampshire,* 354 U.S. 234, 265 (1957) (FRANKFURTER, J., concurring) ("For a citizen to be made to forego even a part of so basic a liberty as his political autonomy, the subordinating interest of the State must be compelling."); *Thomas v. Collins,* 323 U.S. 516, 530

---

by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.' " The *Dennis* test evolved into the so-called "balancing" test of *American Communications Assn. v. Douds,* 339 U.S. 382, 399 (1950) ("when particular conduct is regulated in the interest of public order, and the regulation results in an indirect, conditional, partial abridgment of speech, the duty of the courts is to determine which of these two conflicting interests demands the greater protection under the particular circumstances presented."), *see also Konigsberg v. State Bar of California,* 366 U.S. 36 (1961).

Many of the cases cited in the body of this opinion applied, either explicitly or implicitly, some permutation of the "balancing" test which survived as an expressly adopted First Amendment test on into the late 1960's. During this period the Court applied, in addition, a variety of more traditional methods in striking down statutes infringing upon First Amendment principles. Vagueness has been a recurring standard, *see Keyishian v. Board of Regents,* 385 U.S. 589 (1967), as has overbreadth, *NAACP v. Button,* 371 U.S. 415 (1963).

What has emerged, and what this Court has sought to apply, is an *ad hoc* approach which incorporates balancing concepts when the situation warrants it, as we feel it does here, *see Brandenburg v. Ohio,* 395 U.S. 444 (1969).

(1944); *see also* Black, *The Bill of Rights,* 35 N.Y.U.L. Rev. 865 (1960).

Rather, before any inquiry can be made into the level of First Amendment protection, a preliminary determination must be made that the expression is within its ambit, *see* Kalven, *The Reasonable Man and the First Amendment: Hill, Butts and Walker,* [1967] Sup. Ct. Rev. 267, 278, 290; BeVier, *The First Amendment and Political Speech: An Inquiry Into the Substance and Limits of Principle,* 30 Stan. L. Rev. 299, 301, 311 (1978).

Of specific relevance to defining the ambit of First Amendment protection is an appreciation of the form of government established by the Constitution, and the role freedom of expression was intended to play in preserving a representative democracy. Though the system as we know it today has been moulded and remoulded by application to different circumstances and social problems, the concept remains essentially a product of the development of the liberal constitutional state.

Though much debate has been generated seeking to define the scope of First Amendment protection, there remains as a fundamental initial proposition that "a major purpose of th[e] [First] Amendment was to protect the free discussion of governmental affairs, . . . of course includ[ing] discussions of candidates. . . ." *Mills v. Alabama,* 384 U.S. 214, 218 (1966); *see also Abood v. Detroit Board of Education,* 431 U.S. 209, 231 (1977); *Buckley v. Valeo, supra.*

"It would follow, then, that the First Amendment should protect and indeed encourage speech *so long as it serves to make the political process work.* . . ." A. BICKEL, THE MORALITY OF CONSENT 62 (1975) (emphasis added). Therein lies our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-

open. . . ." *New York Times, Inc. v. Sullivan,* 376 U.S. 254, 270 (1967); simply that as a fundamental principle of a constitutional system of government "free political discussion [must be maintained] to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means." *Stromberg v. California,* 283 U.S. 359, 369 (1931).[6]

What is crucial to our politics is discussion, an exchange of views, opinion, debate, a ventilation of desires, hopes or aspirations. Accordingly, what is crucial to First Amendment protection is the public nature of the communication. *Pickering v. Board of Education,* 391 U.S. 563, 571-72 (1968) (dispute concerned "a difference of opinion . . . as to the preferable manner of operating the school system, a difference of opinion that clearly concerns an issue of general public importance"); *Sprague v. Fitzpatrick,* 546 F.2d 560, 565 (3rd Cir. 1976); *Roseman v. Indiana University of Pennsylvania at Indiana,* 520 F.2d 1364, 1368 (3rd Cir. 1975); *Hopkins v. Dolinger,* 453 F. Supp. 59, 61 (W.D. Va. 1978); *Lewis v. Southeastern Pennsylvania Transportation Authority,* 440 F. Supp. 887, 892 n. 6 (E.D. Pa. 1977); *Pilkington v. Bevilacqua,* 439 F. Supp. 465, 474 (D.R.I. 1977).

Even given the existence of an issue of public concern and importance, however, it has never been held that there does not exist a scale of societal values

---

[6] *See also,* Bork, *Neutral Principles and Some First Amendment Problems,* 47 Ind. L.J. 1, 20 (1970); BeVier, *The First Amendment and Political Speech: An Inquiry Into the Substance and Limits of Principle,* 30 Stan. L. Rev. 299, 308 (1978); A. MEIKLEJOHN, FREE SPEECH AND ITS RELATION TO SELF-GOVERNMENT 26 (1948); A. BICKEL, THE MORALITY OF CONSENT 62 (1975); EMERSON, *supra* n. 5 at 9; Emerson, *Colonial Intentions and Current Realities of the First Amendment,* 125 U. Pa. L. Rev. 737, 742 (1977); Rehnquist, *The First Amendment: Freedom, Philosophy And The Law,* 12 Gonz. L. Rev. 1, 4 (1976).

which may compromise in part the value society places on uninhibited freedom of speech. "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949); *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 456 (1978). Judicial concepts must respond to certain pragmatic concerns, sometimes at the expense of the abstract legitimacy inherent in a certain manner of expression or its content, "for the First and Fourteenth Amendments have never been thought to give absolute protection to every individual to speak whenever or wherever he pleases, or to use any form of address in any circumstances that he chooses." *Cohen v. California,* 403 U.S. 15, 19 (1971).

These pragmatic concerns have operated in a variety of settings to compromise speech or elements thereof, predominantly within the context of a need for order, or, in the least, orderly operation. *See Greer v. Spock,* 424 U.S. 828 (1976) (picketing and leafleting on military post); *Hudgens v. NLRB,* 424 U.S. 507 (1976) (picketing at shopping center restricted); *Buckley v. Valeo, supra* (limitation on amount of political contribution); *United States v. O'Brien,* 391 U.S. 367 (1968) (conviction for burning draft card); *Adderly v. Florida,* 385 U.S. 39 (1966) (demonstration at jailhouse). In other settings the First Amendment interest has been held to predominate. *See Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546 (1975) (refusal of application to present musical play); *Procunier v. Martinez,* 416 U.S. 396 (1974) (prison mail restrictions); *Cohen v. LaRue,* 409 U.S. 109 (1972); *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503 (1969); *Brown v. Louisiana,* 383 U.S. 131 (1966) (peaceful demonstration in library);

*Cox v. Louisiana,* 379 U.S. 536 (1965) (assembly outside of courthouse).

The methodology applied in these cases has sought to balance the individual and social interest in freedom of expression against the social interest sought by the regulation which restricts expression. *See American Communications Ass'n v. Douds,* 339 U.S. 382, 399 (1950) ("When particular conduct is regulated in the interest of public order, and the regulation results in an indirect, conditional, partial abridgement of speech, the duty of the courts is to determine which of these two conflicting interests demands the greater protection under the particular circumstances presented."); *see also Pickering v. Board of Education, supra* at 568 ("the interests of the [employee], as a citizen, in commenting upon matters of public concern" must be balanced against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

The Supreme Court has made clear, however, that when engaged in the balancing test a distinction must be made between regulation of the nonspeech element of a particular mode of expression, or the time, place and manner of the expression, and direct regulation of the form or content of the expression. *See Buckley v. Valeo, supra* at 16; *United States v. O'Brien, supra* at 376-77; *American Communications Ass'n v. Douds, supra* at 399; *Cox v. Louisiana, supra; Adderly v. Florida, supra; Linmark Assoc., Inc. v. Twp. of Willingboro,* 431 U.S. 85, 93 (1977); *Erznoznik v. City of Jacksonville,* 422 U.S. 205 (1975); *Kovacs v. Cooper,* 336 U.S. 77 (1949). A conviction in *O'Brien,* for instance, was upheld because the Court felt that despite the First Amendment being brought into play by the communicative element in O'Brien's conduct (burning one's draft card as a protest against the war), there was "a sufficiently important government interest in

regulating the nonspeech element . . . unrelated to the suppression of free expression." *Id.* at 376-77. This was not a case "where the alleged governmental interest in regulating conduct [arose] in some measure because the communication allegedly integral to the conduct [was] itself thought to be harmful." *Id.* at 382.[7] *See also, Lattanzio v. Unemployment Compensation Board of Review,* 10 Pa. Commonwealth Ct. 160, 309 A.2d 459 (1973).

Implicit in the above is the assumption that the more direct and intrusive the regulation on the form and content of expression, the more compelling must be the governmental interest sought to be protected. *Cohen v. California, supra* at 18; *Sherbert v. Verner, supra* at 403-07; *NAACP v. Button,* 371 U.S. 415, 439 (1963); *Thomas v. Collins, supra* at 530.

Appellant urges upon us this "compelling state interest" formula, yet fails to construct how he perceives his expression addresses a public issue or propounds any idea, view, sympathy or belief pertaining to any item, debate, fact or circumstance which is, has been, or could possibly be of public concern; nor has he sought to bring the governmental action within that class of regulation directed to the form or content of his expression.

To be sure, "[w]holly neutral futilities . . . come under the protection of free speech as fully as do Keats' poems or Donne's sermons," *Winters v. New York,* 333 U.S. 507, 528 (1948) (FRANKFURTER, J., dissenting); *Abood v. Detroit Board of Education, supra*

---

[7] *See Buckley v. Valeo, supra* at 18:

[These] cases stand for the proposition that the government may adopt reasonable time, place and manner regulations, which do not discriminate among speakers or ideas, in order to further an important government interest unrelated to the restriction of communication.

at 231 ("[O]ur cases have never suggested that expression about philosophical, social, artistic, economic, literary, or ethical matters . . . is not entitled to full First Amendment protection."); and governmental denial of benefits though incidental in nature, may indeed operate as a significant burden upon one's free exercise of First Amendment freedoms, "[f]or if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited." *Perry v. Sindermann,* 408 U.S. 593, 597 (1972);[8] it is, however, apparent to us that as speech content wanders away from the fundaments of political speech and democratic government, and as the government regulation approaches time, place and manner restrictions, whether direct or indirect, then greater deference to legitimate governmental concerns is required.

Nothing in Bala's note indicates that the message sought to be conveyed was anything but anger at not having been met in the hotel lobby. The closest the note comes to any matter of public concern or otherwise political expression is to indicate appellant's intention to discontinue association with the Harris campaign, which intentions would appear to have been precipitated solely by what appellant believed to be rudeness on the part of Harris's campaign manager.[9]

---

[8] *See, e.g., Graham v. Richardson,* 403 U.S. 365 (1971) (welfare payments); *Keyishian v. Board of Regents, supra* (denial of public employment); *Speiser v. Randall,* 357 U.S. 513 (1968) (tax exemptions); *Sherbert v. Verner, supra* (unemployment compensation). *See also,* Van Alstyne, *The Demise of The Right—Privilege Distinction in Constitutional Law,* 81 Harv. L. Rev. 1439, 1445-46 (1968) ("[w]hatever an express constitutional provision forbids the government to do directly it equally forbids the government to do indirectly").

[9] *DeGrego v. Levine,* 362 N.Y. Supp. 2d 207, 46 A.D.2d 253 (1974), relied on by appellant, is easily distinguishable by the content of

Several considerations inveigh against First Amendment protection for this expression.

First, we fail to see the concern the public could have in the pique of a potential campaign aide. The fact that hurt feelings arise within the context of a political campaign cannot by that fact alone engender the strict review of government action reserved for political speech. The means by which Bala's feelings were communicated are significant in this regard. The use of a public forum has been held to be at least an *indicium* that the matter is one of public concern at least insofar as the communication is concerned. *See Roseman v. Indiana University of Pennsylvania at Indiana, supra* at 1368 (private communication receives less protection than public forum communication).

---

the message. Claimant DeGrego had been fired for wearing an "Impeachment with Honor" button, and had been denied unemployment compensation. We quote from the New York Court's opinion:

> We do not take issue with the right of an employer to discharge an employee for reasons which in the employer's view would have an adverse effect on business. . . . [However], [i]t cannot be seriously disputed here that the button worn by claimant was a manifestation of thought protected by the First Amendment. The fact that the thought conveyed by claimant's button was controversial is all the more reason for holding that the State cannot be permitted to take a position which would bring into play its power to withhold unemployment insurance benefits as a coercive factor.

*Id.* at 208-09, 46 A.D.2d at    ; nor do we take issue with this construction as it fits neatly within our perception of First Amendment principle and underscores our opinion that more than mere speech and denial of benefits are to be considered. Bala's "message" was, and was intended to be, isolated within the framework of the personal interaction between himself and Geisman. It had none of the earmarks of controversy, thought provocation, and political statement that the New York case had; it was not conveyed in the same public manner; and it did not address an issue of then current local or national concern.

Though we do not wish to imply that private communication will necessarily deprive speech, otherwise appropriate for public consideration, of constitutional protection, *Givhan v. Western Line Consolidated School District,* U.S. , n. 4, 58 L.Ed. 2d 619, 624 n. 4 (1979); *Pilkington v. Bevilacqua, supra* at 475-76; *Roseman v. Indiana University of Pennsylvania at Indiana, supra* at 1368 ("As Roseman's communications were made in forums not open to the general public and concerned an issue of less public interest than Pickering's, the First Amendment interest in their protection is correspondingly reduced"), we are of the opinion that the private nature of the communication is of significance when the public nature of the interest within the communication is otherwise not apparent.

Nor can we disregard the fact that the action taken by the Board in denying benefits was not taken to restrain Bala from voicing his dissatisfaction with Geisman's manners, or any other possible meaning attributable to the note, but was taken because it found as a matter of law that Bala was guilty of willful misconduct for disturbing a guest and interfering with the operation of his employer's business. This differs in significant kind from the situation addressed in *Sherbert v. Verner, supra,* where the Court held unconstitutional denial of unemployment compensation benefits to a claimant who refused to work Saturdays in observance of Seventh Day Adventist dogma. No viable alternatives were available in *Sherbert,* whereas the instant claimant had myriad opportunities outside the confines of his employment to communicate by mail, telephone, spoken word or any other means the nature of his dissatisfaction.

Finally, we are ever mindful of the fact that the Legislature has declared it to be in "the public good and the general welfare of the citizens of this Com-

monwealth [to] require the exercise of the police powers of the Commonwealth in the enactment of this act for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own." Section 3 of the Law, 43 P.S. §752. Accordingly, the Commonwealth has an interest in the compensation fund against dissipation by those not entitled to payments under the statutory law. *Lybarger Unemployment Compensation Case,* 203 Pa. Superior Ct. 336, 340, 201 A.2d 310, 312 (1964); *Gagliardi Unemployment Compensation Case,* 186 Pa. Superior Ct. 142, 141 A.2d 410 (1958). In furtherance of that interest the Legislature has deemed it appropriate to declare ineligible for benefits any employee whose employment is due to discharge or suspension from work for willful misconduct. The symbiosis between the Commonwealth's interest in preserving the fund and the employer's interest in discharging for willful misconduct any employee disregarding its rules, *Simet v. Unemployment Compensation Board of Review,* 40 Pa. Commonwealth Ct. 85, 396 A.2d 893 (1979); *Holomshek v. Unemployment Compensation Board of Review,* 39 Pa. Commonwealth Ct. 503, 395 A.2d 708 (1979), or failing to heed instructions after having been warned, *Troyen v. Unemployment Compensation Board of Review,* 34 Pa. Commonwealth Ct. 445, 383 A.2d 975 (1978), permits us to analogize to cases addressing the issue of freedom of speech within the context of public employment wherein

> [T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the

(employee) as a citizen, in commenting upon matters of public concern and the interest of the employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering v. Board of Education, supra* at 568.

In arriving at this balance consideration has been given to whether the particular sanction has been imposed for reasons unrelated to the speech element, *see, e.g., Caffas v. Board of School Directors,* 23 Pa. Commonwealth Ct. 578, 353 A.2d 898 (1976), or because the speech content demonstrated some undesirable trait such as insubordination or disloyalty, *see, e.g., Sprague v. Fitzpatrick, supra; Phillips v. Adult Probation Department,* 491 F.2d 951 (9th Cir. 1974). We are here concerned with a hybrid situation where it is not the speech element, but the manner of delivery, which represents the insubordinative element giving rise to discharge and "sanction" in the form of denial of benefits. We believe there has been sufficient showing on the part of the employer to conclude that the time and manner of delivery and the nature of the content interfered with appellant's job responsibilities so as to warrant denial of benefits. *Cf. Chalk Appeal,* 441 Pa. 376, 272 A.2d 457 (1971) (public assistance caseworker's advice to welfare recipients to pressure their caseworkers and demand their rights protected because of no showing of deleterious effects of speech); *Holodnak v. Avco Corp.,* 514 F.2d 285 (2nd Cir. 1975), *cert. denied,* 423 U.S. 892 (1975) (dismissal for speech unjustified because it had not interfered with operation of plant).

Consequently, balancing the interest of the Commonwealth in maintaining the fund against Bala's interest in conveying his message, considering at the same time the context of the message and the indirect

effect of the state action only upon time, place and manner of delivery, we cannot hold that the Board's action denied appellant a First Amendment right to freedom of speech.[10]

The Hotel has succeeded in proving that the appellant here disregarded the policy of his employer and ignored warnings that he was to cease interaction with hotel guests. We conclude that he was guilty of willful misconduct within the meaning of Section 402(e) of the Law.

---

[10] This analysis suggests at least three employee-employer contexts in which the *Pickering* balance analysis is appropriate: Public context-public content; public context-private content; private context-public content. We feel justified in including a fourth item: private context-private content due to the possible chilling effect exclusion of such expression could have upon *possible* discussion of matters of governmental interest or otherwise public concern. In the hierarchy of protection of course, the balancing would weigh least favorably in protecting this final type of expression. *See, Givhan v. Western Line Consolidated School District,* U.S. , n. 4, 58 L.Ed. 2d 619, 624 n. 4 (1979) ; Note, *The Nonpartisan Freedom of Expression of Public Employees,* 76 Mich. L. Rev. 365, 390 n. 99 (1977) ; *see also Roseman v. Indiana University of Pennsylvania at Indiana, supra* at 1368, containing an analogous fact situation to the instant case wherein the court touched upon this hierarchical analysis and distinguished *Pickering v. Board of Education, supra* :

> The communications made by the plaintiff in the case before us differ from Pickering's in two crucial respects. In the first place *Roseman's expressions were essentially private communications* in which only members of the Foreign Language Department and the Dean of the College of Arts and Sciences were shown by the plaintiff to have had any interest. Pickering's letter to the editor, urging the electorate with respect to a pending tax proposal, was, by contrast, a classic example of public communication on an issue of public interest . . .[11] (Emphasis added.) (footnotes omitted).

[11] Thus, if Roseman's communications . . . had been on issues of public interest, or if she had convinced local news media that her grievance . . . was newsworthy, entirely different considerations would come into play.

## ORDER

Now, May 8, 1979, the order of the Unemployment Compensation Board of Review, Decision No. B-139385, dated January 7, 1977, is hereby affirmed.

---

DISSENTING OPINION BY JUDGE ROGERS:

I must respectfully dissent. The Board denied unemployment compensation benefits to one who was discharged from his work for exercising his right of freedom of speech guaranteed by the First Amendment of the Constitution of the United States without a showing of a compelling State interest justifying its action.

The United States Supreme Court has written:

> For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.

*Perry v. Sinderman,* 408 U.S. 593, 597 (1972).

In *Sherbert v. Verner,* 374 U.S. 398 (1963), the Court applied this declaration of fundamental principle to overturn a state's denial of unemployment compensation benefits to a claimant who invoked another right guaranteed by the First Amendment when she was discharged from her employment because she refused to work on Saturday, the Sabbath day of her faith. The following language of *Sherbert v. Verner, supra,* provides the guidelines by which we must reach judgment in this case:

In Speiser v. Randall, 357 U.S. 513, 2 L.ed. 2d 1460, 78 S.Ct. 1332, we emphasized that conditions upon public benefits cannot be sustained if they so operate, whatever their purpose, as to inhibit or deter the exercise of First Amendment freedoms. We there struck down a condition which limited the availability of a tax exemption to those members of the exempted class who affirmed their loyalty to the state government granting the exemption. While the State was surely under no obligation to afford such an exemption, we held that the imposition of such a condition upon even a gratuitous benefit inevitably deterred or discouraged the exercise of First Amendment rights of expression and thereby threatened to 'produce a result which the State could not command directly.' 357 U.S. at 526. 'To deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech.' Id. 357 U.S. at 518.

. . . .

We must next consider whether some compelling state interest enforced in the eligibility provisions of the South Carolina Statute justifies the substantial infringement of the appellant's First Amendment right. It is basic that no showing merely of a rational relationship to some colorable interest would suffice; in this highly sensitive constitutional area, '[o]nly the gravest abuses, endangering paramount interest, give occasion for permissible limitation,' Thomas v. Collins, 323 U.S. 516, 530. . . . 374 U.S. at 405, 406. Hence, unemployment compensation may not be denied to a claimant discharged from his employment for exercising a freedom protected by the First Amendment unless the state shows a compelling interest served by its action.

The majority's opinion first seems to say that Mr. Bala's letter to Senator Harris's campaign manager was entitled to a somehow limited protection either because it was an expression of personal pique or because it was uttered in private. Neither consideration limits the extent of First Amendment rights. However motivated, the communication clearly expresses Mr. Bala's opinion concerning the qualifications of a candidate for the Presidency—"I was to go to Atlanta this coming week, to discuss Penna. strategy with the Carter people. My minister convinced me to work with the Harris campaign instead. Tell Harris to hoard his money for another State, he can truly kiss Pennsylvania goodbye." That Mr. Bala may have spoken in anger is of no moment. We have made in this country a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Nor does the privacy of the setting for the communication strip it of protection. In *Givhan v. Western Line Consolidated School District*, 99 S.Ct. 693 (1979), the Court concluded that a school employee's privately uttered demands on a superior in insulting, hostile, loud and arrogant manner were entitled to First Amendment protection. Mr. Justice REHNQUIST wrote for a unanimous court:

> The First Amendment forbids abridgement of the 'freedom of speech'. Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public. We decline to adopt such a view of the First Amendment.

*Id.* at 696-97.

Mr. Bala's letter was about a candidate for office. Concerning such, the Supreme Court in *Buckley v. Valeo,* 424 U.S.. 1, 14 (1976), has recently written:

> Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' . . . Although First Amendment protections are not confined to 'the exposition of ideas,' Winters v. New York, 333 U.S. 507, 510, 92 L.Ed 840, 68 S.Ct. 665 (1948), 'there is practically universal agreement that a major purpose of th[e] Amendment was to protect the free discussion of governmental affairs, . . . of course includ[ing] discussions of candidates. . . .'

In any event, the majority, despite its misgivings, seems to have concluded that Mr. Bala's speech was entitled to First Amendment protection. It then, without stating any reason for doing so, analogizes this case "to cases addressing the issue of freedom of speech within the context of public employment" and proceeds to balance "the interest of the Commonwealth in maintaining the fund against Bala's interest in conveying his message." Mr. Bala was not a public employee and a simple balancing of the interests of Mr. Bala and the State was inappropriate. As the majority indeed notes, Mr. Justice THURGOOD MARSHALL wrote in *Pickering v. Board of Education,* 391 U.S. 563, 568 (1968), "it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."

As *Sherbert v. Verner, supra,* clearly teaches, the State's reinforcement of the employer's infringement of Mr. Bala's right of speech could only be justified by the showing of a compelling state interest for so doing. The only state interest alluded to by the majority is the concern that the Unemployment Compensation Fund not be dissipated. This same consideration was advanced in *Sherbert v. Verner, supra,* and disposed of by the observation that it was highly doubtful that evidence of the dilution of the Fund would warrant an infringement of First Amendment rights and even if it did, the state would have further to demonstrate that no alternative forms of regulation would combat such abuses.

Finally, we note that the only state appellate courts which, so far as we have been able to ascertain, have been confronted by the issue of this case, have held that compensation could not be denied employees who are unemployed by reason of the exercise of their liberty of expression. In California, where hair style is considered an expression of personality, it is held that unemployment compensation may not be denied to persons discharged on this account. *King v. California Unemployment Insurance Appeal Board,* 25 Cal. App. 3d 199, 101 Cal. Rptr. 660 (1972); *Thornton v. Department of Human Resources Development,* 32 Cal. App. 3d 180, 107 Cal. Rptr. 892 (1973). In *DeGrego v. Levine,* 46 A.D.2d 253, 362 N.Y.S. 2d 207 (1974), *aff'd,* 39 N.Y. 2d 188, 383 N.Y.S. 2d 250 (1976), unemployment benefits were held to have been improperly denied a worker who was discharged when he insisted on wearing a button bearing political comment.

I would reverse and remand the record for computation of benefits.

Judges CRUMLISH, JR. and CRAIG join in this dissent.