**Richard S. SPRAGUE, Appellant,**

v.

**F. Emmett FITZPATRICK, Jr., Individually, Appellee.**

**No. 76–1266.**

United States Court of Appeals, Third Circuit.

Argued Oct. 19, 1976.

Decided Dec. 6, 1976.

Thomas B. Rutter, Philadelphia, Pa., for appellant.

James E. Beasley, Jeffrey M. Stopford, Beasley, Hewson, Casey, Colleran & Stopford, Philadelphia, Pa., for appellee.

Before SEITZ, Chief Judge, and HUNTER and GARTH, Circuit Judges.

JAMES HUNTER, III, Circuit Judge:

Richard A. Sprague, former First Assistant District Attorney of Philadelphia County, appeals from the dismissal of his action for damages against F. Emmett Fitzpatrick, District Attorney of Philadelphia County. Treating the dismissal below as a summary judgment for defendant Fitzpatrick, we affirm.

I.

The material facts are not in dispute. Fitzpatrick took office as District Attorney

in 1973. Sprague, who had been First Assistant District Attorney under Fitzpatrick's predecessor, agreed to remain in that position. The First Assistant is the District Attorney's "alter ego." He assists the District Attorney in formulating policy, is primarily responsible for administration on a daily basis, keeps the District Attorney informed about the performance of the various units in the office, and acts in the District Attorney's place when the latter is unavailable. In short, the First Assistant is the District Attorney's second-in-command.

In 1974, the District Attorney's office was working on post-trial motions concerning the sentencing of Joseph Nardello. Nardello, who had a long criminal record, had been convicted of receiving stolen goods in 1969. Since 1969, Sprague and his subordinates had repeatedly sought to recommend a 2½ to 5 year prison sentence for Nardello, but the argument on post-trial motions was repeatedly delayed. In July of 1974, Fitzpatrick interceded in the Nardello case. He personally appeared before Nardello's sentencing judge and recommended probation.

After it was discovered that Fitzpatrick had represented Nardello's co-defendant on a federal blackmail charge before leaving private practice, journalists began to inquire about the Nardello matter. Fitzpatrick denied responsibility for the decision to recommend probation for Nardello. Three times he attributed the recommendation to various subordinates who had worked on the case; once he referred to an agreement, supposedly worked out under his predecessor, not to recommend a jail term for Nardello.

A reporter for the Philadelphia Inquirer asked Sprague to comment on Fitzpatrick's public disclaimers. Sprague sharply disputed the truth of each. This interview was published on December 4, 1974, and on December 5, Fitzpatrick demanded Sprague's resignation. When Sprague refused, Fitzpatrick discharged him.

Sprague filed an action for damages of $500,000 against Fitzpatrick in the United States District Court for the Eastern District of Pennsylvania. He alleged that the District Attorney's decision to discharge him because of the exercise of his rights under the first and fourteenth amendments amounted to a deprivation of his constitutional rights in violation of 42 U.S.C. § 1983.[1] Jurisdiction was founded on 28 U.S.C. § 1343(3).[2]

Fitzpatrick moved to dismiss. He contended under Fed.R.Civ.P. 12(b)(6) that the District Attorney was immune from suit under section 1983 and that Sprague had therefore failed to state a claim upon which relief could be granted. Under Fed.R. Civ.P. 12(b)(1), he averred that the suit was actually against the City of Philadelphia, which is not a "person" within the meaning of section 1983, and that the court therefore lacked jurisdiction over the subject matter.

On April 3, 1975, the court denied Fitzpatrick's motion and ordered him to file an answer. It also ordered both parties to file affidavits pertaining to their official relationship and the facts surrounding Sprague's discharge. They complied.

Although the record is unclear on the point, the district court apparently then decided, *sua sponte,* to reconsider its denial of Fitzpatrick's motion to dismiss. On July 25,

1. Section 1983 reads as follows:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

2. Section 1343(3) reads as follows:

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
.  .  . (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States  .  .  ..

1975, the court directed the parties to appear and argue the relevance of *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), to that motion. Fitzpatrick had not renewed his motion to dismiss, but the court stayed plaintiff's discovery motions pending a ruling on dismissal. Evidently, both parties considered the motion to dismiss still before the court, for no objection was raised to this procedure.

On January 9, 1976—nearly six months after announcing its reconsideration of the dismissal motion—the court dismissed the complaint. It rejected Fitzpatrick's claim of prosecutorial immunity, but found that *Pickering* and its progeny foreclosed a finding of liability in this case. It then grounded its dismissal on lack of jurisdiction over the subject matter.

## II.

■ The procedural posture of this case is highly unusual. It is clear that 28 U.S.C. § 1343(3) conferred upon the district court jurisdiction over the subject matter of Sprague's action. He alleged a deprivation under color of state law of his constitutional rights—the plain object of section 1343(3). Moreover, once the court rejected Fitzpatrick's assertion of prosecutorial immunity, it should have been clear that Sprague had stated a claim upon which relief could be granted. *See, e. g., Pickering, supra; Roseman v. Indiana University,* 520 F.2d 1364 (3d Cir. 1975), *cert. denied,* 424

U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976).

■ The procedure followed by the court was actually a dismissal for failure to state a claim under Fed.R.Civ.P. 12(b)(6), which—because matters outside the pleadings had been presented to the court—was transformed into a summary judgment under Fed.R.Civ.P. 56.[3] 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1266 (1969). Fitzpatrick did not formally renew his motion to dismiss under rule 12(b)(6), but both the plaintiff and the court treated it as though it were still pending. There was no disputed issue of material fact, and both parties clearly acquiesced in the court's decision to consider the legal issues in the case. Sprague does not contend that this decision was error. Moreover, he waived any error when he failed to object to the court's decision to treat the motion as still pending. Fed.R.Civ.P. 46.

■ In reconsidering the motion to dismiss, the court considered matters outside the pleadings, thereby converting the dismissal into a grant of summary judgment pursuant to rule 12(b)(6). *Central Contracting Co. v. Maryland Casualty Co.,* 367 F.2d 341, 343 (3d Cir. 1966). No point would be served by remanding simply to permit the parties or the court to renew and relabel the various motions or orders; therefore, we will accept the view of the parties that the dismissal was, in effect, a summary judgment for defendant.[4] *Romero v. International Terminal Operating Co.,*

---

**3.** Rule 12(b) reads in pertinent part as follows:

Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: . . . (6) failure to state a claim upon which relief can be granted . . . . If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall

be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

**4.** Other observers have commented as follows on this issue:

. . . [I]f the record clearly presents the issue as to whether summary judgment should be entered and both parties have had a reasonable opportunity to present affidavits and other evidence, for the sake of judicial economy appellate courts generally will make an immediate determination of the issue rather than remanding the cases to the district court for disposition.
5 C. Wright & A. Miller, Federal Practice & Procedure ¶ 1266, at 680 n.67 (1969).

358 U.S. 354, 357 n.4, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959).

### III.

Fitzpatrick insists that the district court improperly rejected his claim of prosecutorial immunity under section 1983. We note that this immunity has not yet been extended to "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." *Imbler v. Pachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *see id.* at 431 n. 33, 96 S.Ct. 984, 995. But Fitzpatrick maintains that prosecutorial immunity should be held to cloak administrative actions such as the discharge involved here. The hiring and firing of the subordinates through whom he acts, says Fitzpatrick, is the District Attorney's ultimate discretionary act in his service to the public; therefore, such decisions ought to repose within the safe harbor of section 1983 immunity.

We need not resolve that thorny issue in this case. Assuming, without deciding, that the district court correctly held defendant Fitzpatrick's administrative action outside the scope of prosecutorial immunity, we nevertheless affirm the summary judgment for defendant. We do so on the basis of *Pickering* and *Roseman.*

In *Pickering,* a high school teacher wrote a letter to a local newspaper criticizing the way the school board and the superintendent had handled recent bond issues. The board held a hearing and determined that many of the statements in Pickering's letter were false. It found his action detrimental to the operation of the public schools and dismissed him. Illinois courts affirmed Pickering's dismissal. 391 U.S. 565–68, 88 S.Ct. 1731.

The Supreme Court reversed, holding that the board's action violated Pickering's right of free speech. As the *Pickering* court saw it, the problem was to strike a balance between the interest of the public employee as a citizen and that of the state in promoting efficient performance of its employees. *Id.* at 568, 88 S.Ct. 1731. Because of the infinite variety of situations in which such criticism could arise, however, the Court refused to establish a bright-line test for protected speech in the public employee context. *Id.* at 569, 88 S.Ct. 1731. Instead, it adopted a balancing test, weighing the employee's interest in free speech against the harm likely to result to the state's provision of service. The crucial variant in this balance appears to have been the hierarchical proximity of the criticizing employee to the person or body criticized. The court noted that the

> statements are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here. Appellant's employment relationships with the Board and, to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning.

*Id.* at 569–70, 88 S.Ct. at 1735. The Court also observed that "significantly different considerations would be involved" in cases where "the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them." *Id.* at 570 n.3, 88 S.Ct. at 1735. Several cases have dealt with such disruptive statements and found them outside first amendment protection. *See, e. g., Clark v. Holmes,* 474 F.2d 928 (7th Cir.), *cert. denied,* 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973); *Duke v. North Texas State University,* 469 F.2d 829 (5th Cir.), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973). *See also Meehan v. Macy,* 129 U.S.App.D.C. 217, 392 F.2d 822, *modified,* 138 U.S.App.D.C. 38, 425 F.2d 469, 471, *aff'd en banc,* 138 U.S.App.D.C. 41, 425

F.2d 472 (1968) (remanding for reconsideration in light of *Pickering,* but indicating that on present state of evidence employee's speech was unprotected).

This court applied the *Pickering* balancing test in *Roseman.* Roseman, an associate professor at Indiana University, had criticized the acting chairman of her department's teaching staff. One week later, the university decided not to renew her contract. We affirmed the district court's holding that Roseman's statements "were not protected by the First Amendment, and therefore might permissibly form part of the basis" of her discharge. 520 F.2d at 1367. We noted first that Roseman's statements did not rise to the level of public importance present in *Pickering. Id.* at 1368. Second, the crucial element of disruptive impact, absent in *Pickering,* appeared in *Roseman.*

> Pickering's attacks were on a remote superintendent and school board; in contrast, Roseman's called into question the integrity of the person immediately in charge of running a department which, it is fair to assume, was more intimate than a school district. The district court found that "plaintiff's attacks upon Faust's integrity in a faculty meeting would undoubtedly have the effect of interfering with harmonious relationships with plaintiff's superiors and co-workers." 382 F.Supp. [1328] at 1339. In making this finding, the district court reflected a similar concern expressed by the Supreme Court, which noted that Pickering's statements were "in no way directed towards any person with whom [Pickering] would normally be in contact in the course of his daily work as a teacher." *Pickering,* supra at 569–70, 88 S.Ct. 1735. Because of this, Pickering's case raised "no question of maintaining either discipline by immediate superiors or harmony among coworkers." *Id.* at 570, 88 S.Ct. 1735. The same obviously cannot be said of Roseman's faculty meeting accusations direct-

ed at the Acting Chairman of her Department.

*Id.* at 1368–69 (footnote omitted).

█ The case *sub judice* presents an even more egregious example of disruptive impact. The court below found it "beyond question" that Sprague's statements had "totally precluded any future working relationship between him and the defendant . . . .." The First Assistant District Attorney—"alter ego" of the District Attorney, his direct administrative and policymaking subordinate—declared in public that his immediate superior had not told the truth. The irreparable breach of confidence between the two men is evidenced by Fitzpatrick's immediate dismissal of Sprague and Sprague's failure to seek reinstatement as a form of relief in this action. Certainly we could not expect a district attorney to run an efficient office if his first assistant were free to impugn his integrity in public.

It is true that Sprague's interview, in contrast to Roseman's criticisms, concerned matters of grave public import. But this does not tilt the *Pickering* balance in favor of first amendment protection where, as here, the effectiveness of the employment relationship between employee-speaker and employer-target is so completely undermined. Indeed, the public uproar engendered by Sprague's pronouncements is precisely the factor that so thoroughly curtailed Sprague's usefulness as Fitzpatrick's deputy. *See Arnett v. Kennedy,* 416 U.S. 134, 161, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), *citing with approval Meehan, supra,* 392 F.2d at 835 (public criticism of superiors can constitute cause for discharge to promote efficiency of service); *Pickering, supra,* 391 U.S. at 570 n.3, 88 S.Ct. 1731 (suggesting that public criticism could be grounds for discharge). *Roseman* did not hold that the public importance of an employee's statements automatically created first amendment protection. Instead, that importance may be, *mutatis mutandis,* one of the factors to be weighed in favor of protecting the employee-citizen's right to speak on matters of general concern.[5] *Pickering,* 391

5. In *Pickering,* the Supreme Court held that since the subject matter of the communications

was only tangentially related to "the fact of employment," i. e., since Pickering's knowledge

U.S. at 573–74, 88 S.Ct. 1731. The key question under *Pickering,* however, is whether the employment relationship has been seriously undermined. *Id.* at 568–70, 88 S.Ct. 1731. If the arousal of public controversy exacerbates the disruption of public service, then it weighs against, not for, first amendment protection in the *Pickering* balance.

For the foregoing reasons, the judgment of the district court will be affirmed.

Chief Judge SEITZ concurs in the result because of the particular facts involved. He does so on the understanding that the majority is not holding, in effect, that the disruptive factor tips the scales in all such cases.

and views about the use of school funds did not depend on his relationship to the school board, the public importance of the statements meant that the state employer could not punish him for making them. 391 U.S. at 573–74, 88 S.Ct. 1731. In this case, however, the fact of Sprague's employment is inextricably intertwined with his knowledge and views about Fitzpatrick's performance as District Attorney. Sprague cannot claim to be treated, for purposes of that issue, as a mere "member of the general public," as Pickering could with respect to school bonds.