**Jay T. HALL, Plaintiff,**

v.

**BOARD OF EDUCATION, etc., et al., Defendants.**

**No. 85 C 6544.**

United States District Court, N.D. Illinois, E.D.

June 27, 1986.

Penny Nathan Kahan, Chicago, Ill., for plaintiff.

George H. Klumpner, Moss & Bloomberg, Bolingbrook, Ill., for defendants.

**MEMORANDUM OPINION AND ORDER**

SHADUR, District Judge.

Jay Hall ("Hall") initially sued the Board of Education ("Board") of the Valley View Community Unit School District No. 365U ("District"), all Board members, District's Superintendent and Assistant Superintendent of Schools and Romeoville High School ("RHS") Principal David Carlson ("Carlson"), charging:

  1. wrongful refusal to renew Hall's employment contract as an Assistant Principal of RHS, in violation of 42 U.S.C. § 1983 ("Section 1983") (Counts I and II);

  2. Carlson's tortious interference with the Hall-District employment relationship (Count III);

3. violation of Illinois Personnel Records Act § 9, Ill.Rev.Stat. ch. 48, ¶ 2009 (Count IV); and

4. as to Carlson, common-law defamation (Count V).

This Court's August 13, 1985 memorandum opinion and order (the "Opinion") dismissed Hall's Complaint (the "Complaint") as to all defendants except Carlson.

Carlson has now moved for summary judgment under Fed.R.Civ.P. ("Rule") 56 as to Counts I and II. For the reasons stated in this memorandum opinion and order, the motion is denied.

### Facts [1]

Board hired Hall June 26, 1984 to serve as an RHS Assistant Principal under a one-year renewable employment contract (¶ 13). Hall's background included a 1970 bachelor's degree in education, a 1972 master's degree and a 1983 doctorate (Hall Oct. Dep. 4–5). From 1970 on he held a variety of teaching, counseling and administrative positions at high schools and colleges in Illinois and California (id. 107–12). Hall made no secret of his career ambitions: During his RHS job interview he told Carlson he wanted to be a principal or assistant superintendent and thus could not see himself holding the RHS Assistant Principal's job more than two years (Hall Nov. Dep. 130).

Early in the school year Hall developed a close relationship with physical education teacher Kay Bryant ("Bryant"). Hall and Bryant had worked together during October, overseeing RHS' homecoming activities, and Hall "became enamored by her" (Hall Oct. Dep. 31). Hall and Bryant began dating October 26 (id.).

Initially Hall and Carlson were friendly if not "good friends" (id. 38). But on November 6 Carlson went to Hall's office and raised the Hall-Bryant relationship (id. 29):

Q. Do you recall the first topic of conversation, the first subject?

A. Yes.

Q. What was the first subject?

A. He asked me to quit seeing Kay Bryant.

Q. Were those pretty much his exact words?

A. Yes.

Q. What else did he say to you?

A. He said that it was the talk of the school and he was afraid it would break her heart.

Q. And what did you say to him?

A. I assured him that I intended no harm to Kay Bryant and felt that I was in love with her and wanted to continue to see her.

Q. And you used those words, "I'm in love with her"?

A. Yes.

Carlson then simply said "Okay" and left (id. 35). Hall says the conversation was "intense": "[I]t sounded like an order to me to stop seeing Kay" (id. 88).

Hall did not stop seeing Bryant. On November 9 Hall's ex-wife Paula Smith ("Smith") came up from Urbana, Illinois to Hall's Bolingbrook home to visit her stepdaughter Stacy ("Stacy") [2] (Smith Aff. ¶ 4). Hall then left Stacy with Smith, telling Smith he was going to Chicago (Hall Oct. Dep. 77, 79). Smith was unsure of Hall's precise plans for returning,[3] and Smith Aff. ¶ 4 says:

---

1. Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (a proposition most recently expounded on in *Celotex Corp. v. Catrett*, — U.S. —, —, 106 S.Ct. 2548, 2552–55, 91 L.Ed.2d 265 (1986)). For that purpose this Court must view the evidence in the light most favorable to the non-movant—in this case Hall. *Anderson v. Liberty Lobby, Inc.*, — U.S. —, —, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Where Carlson's Answer has admitted allegations in the Com-

plaint, this opinion will simply cite to the Complaint in the form "¶ —."

2. Smith was Hall's fourth wife—Bryant's immediate predecessor (Hall Nov. Dep. 20). Hall had custody of Stacy, who was born in 1970 of Hall's first marriage (Hall Oct. Dep. 6).

3. Hall Oct. Dep. 78 says:
   I told her I'd be back in time to change clothes to go to a [November 10] playoff game at Romeoville. . . .

Through some confusion on my part, I became concerned about Jay's whereabouts after he did not come home Friday night, November 9, 1984.

Early November 10 Smith called Carlson at home, leaving a message for Hall to call her when he arrived for work at RHS (*id.* ¶ 5).[4] About 1½ hours later, Carlson called Smith at Hall's home, looking for Hall. Smith "became worried" and went over to RHS (*id.* ¶ 6). When she arrived there Carlson told her Hall had been dating an RHS teacher (*id.* ¶ 7). Carlson made "at least two calls" in an attempt to locate Hall, though Smith says she objected to his doing so (*id.*).

One such call was to Bryant's mother's house, where Hall and Bryant in fact were (Hall Oct. Dep. 81). Hall was "infuriated" by the call (*id.* 82):

Again, the conversation on November 6 was fresh in my mind and I felt that I was being intimidated to a certain extent. So I got mad.

After Hall "cursed" Carlson (*id.*), Smith came on the line. She was crying and said she wanted to know where Hall was (*id.* 83). Hall told her she was "way out of line" (*id.*).

On November 13 Hall asked Bryant and Carlson into his office and told Carlson he and Bryant intended marriage. According to Hall Oct. Dep. 89 Carlson:

was very abrupt and sullen. Oh, is that so? Well, do it. And he walked out the door.

Bryant Aff. ¶ 6 says Carlson did not congratulate the couple and "did not seem to be pleased with the news."

Both Hall and Bryant were absent from school November 16 (Hall Oct. Dep. 41–42). Hall had been feeling ill for several weeks, but that day (a Friday) was the first he had missed on that account (*id.* 43). Bryant met him at his apartment around noon, and the two went out for lunch and a drive (*id.* 47–48).

Next day (Saturday) Hall and Bryant lunched again, and in the afternoon they bought a wedding ring (*id.* 39, 52). Sunday evening they dropped in on Carlson and his wife because (*id.* 37–38):

A. I thought we were friends. And I just had a diamond set for Kay, and I wanted to show it to Dave. And of course, Kay was wearing the ring. I was happy.

BY MR. K[L]UMPNER:

Q. You said you went over because you thought you were friends?

A. Right. I wanted him to see the ring.

\* \* \* \* \* \*

You know, I hadn't known him for that long but I thought he was somebody that I wanted to share my good feelings with. That's all.

Carlson did not reciprocate Hall's professed bonhomie. During the half-hour Hall and Bryant spent at the Carlson home, Carlson appeared "very apprehensive and agitated" and "moved about in his seat a lot" (*id.* 38). His main interest was in establishing the date Hall had purchased the ring (*id.* 38–39).

Carlson had heard a "report" from his secretary that Hall and Bryant took off November 16 to buy the wedding ring (Carlson Dep. 34–36). Though Carlson knew Hall was sick he "wasn't thrilled" that (*id.* 36):

there was an attempt, an intent by an administrator with another staff member to take a day off for a purpose other than what they claimed....

Carlson said nothing of that during the Hall-Bryant visit. But when Hall came to work Monday November 19 he found a memo from Carlson waiting (Hall Oct. Dep. 39–40). That memo (dated November 16) raised several questions about Hall's attention to his duties (Carlson Dep. Ex. 2, at

---

4. Smith Aff. ¶¶ 3 and 5 say she had met Carlson before and considered she had a "cordial" relationship with him.

10).[5] Hall thought the questions Carlson's memo raised were "mundane" and went to Carlson's office to discuss them (Hall Oct. Dep. 41):

Suddenly things were emphasized that hadn't been emphasized before.

Hall told Carlson (*id.* 50–51):

I thought it was deceptive to pass that memo to me when it was literally full of issues that were nonissues.

Carlson said (*id.* 51):

he felt the issues were relevant, he felt that my relationship with Kay was damaging to him and to my position.

Then Carlson told Hall he had heard Hall and Bryant spent November 16 shopping for a wedding ring, and he asked if that was true. Hall said it was not (*id.* 51–52), but Carlson indicated he didn't believe Hall's story (*id.* 54). According to Hall (*id.* 90):

The gist of the conversation was there was a rumor that we were shopping for a ring and he kept drilling me on that issue. You know, the memo, which constituted issues regarding school discipline, etcetera, appeared to be insignificant.

You know, the real issue was was I shopping for a ring or not. Were Kay Bryant and I doing something behind the scenes that we weren't supposed to be doing? You know, I just thought, God—

\*   \*   \*   \*   \*   \*

I thought that it seemed like he was putting a tremendous amount of importance on what Kay Bryant and I did rather than the job itself.

After November 19 Hall and Carlson did not discuss Bryant for several months (*id.* 91). Hall and Bryant were married in Las Vegas December 26, and when Hall returned to RHS shortly after the New Year he found several staff gifts waiting on his desk. Carlson's wife had sent some tow-

els. Hall went to Carlson's office to offer his thanks, but Carlson (*id.* 92):

looked at me, with [a] sweep of his hand, went essentially like this, my wife got it.

Relations between Hall and Carlson had become decidedly cool. Hall Nov. Dep. 47 says he felt "like an alien." In Hall's view (*id.* 51–52):

I think Mr. Carlson felt that I was a competitor for his position, that I was essentially a wolf in the chicken coop, and that he wanted me out. And I think that he made my life torturous and uncomfortable from November 6th on.

And it just progressively got more and more severe to the extent that no longer was it just between, you know, disagreement on seeing Kay Bryant, but it became, let's find some reason to remove Dr. Hall from his position. I have got to discredit the guy. I have got to talk to staff. I have got to tell individuals that Dr. Hall is an insid[i]ous influence on the school.

On March 1, 1985 Carlson gave Hall a four-page memo entitled "Your Administrative Performance" (Carlson Dep. Ex. 2, at 11–14). Three pages of that memo were devoted to detailing Carlson's versions of the November 1984 events, along with accounts of two Hall-Carlson arguments in January 1985. In its operative section, Carlson's memo said (*id.* at 11):

You have demonstrated strengths and weaknesses in your job performance at RHS. To most observers, your performance may appear acceptable. However, I can not overlook a major problem that has occurred in your performance with me. I believe that you have lied to me about your actions last November 16, 1984. As a result of that incident, I do not trust you.

During my years as principal of RHS, I have attempted to develop and cultivate a desirable rapport with all people in the school community. I have expected my

---

**5.** Carlson had never before sent Hall any written memorandum critical of his job performance (Hall's non-responded-to, and hence admitted, Request for Admission No. 1). Indeed, during October 1984 Carlson had told District's Superintendent Hall was doing a good job handling RHS' discipline program (*id.* No. 2).

assistant principals to work cooperatively with me in effectively leading the faculty toward school improvement. I have fostered an honest, open atmosphere with all employees and I have expected all staff members to respond to my leadership in a positive manner. RHS has had one of its best years this year. While I do acknowledge the part you have played this year, I have been led to believe that your relationship with me has been severely damaged to the point of disrepair. I have decided to recommend that the board of education not renew your administrative contract for the 85–86 school year.

And—underlining Carlson's view of the November 1984 events—the memo concluded (*id.* at 14):

The principal does not trust Dr. Jay T. Hall.

Carlson says the perceived lie about November 16 was "certainly the catalyst" that changed his relationship with Hall (Dep. 231), and goes on to say (*id.*):

If at some point in November or December, January, I had felt that he, you know, wanted to be truthful about the specifics of November, there's a chance that we might not be here today in this deposition process.

However, the lying that I believe occurred was not quite as critical as the other things that I mentioned in his administrative performance which include his style of leadership and his ego, his arrogance and his commitment to the job. To summarize, no, I don't think I would have recommended that he receive a notice of non-renewal of administrative contract just on the lying episode, but it would have been really made—the real key thing is how he reacted to my questioning and criticism of his personality and how he worked in the job.

After reading the memo in Carlson's presence, Hall told Carlson (Hall Nov. Dep. 91):

"I can't believe that you would have the gall to give me something—something of

this nature in a school setting. It's completely incomprehensible." I said, "It doesn't follow an evaluation format. It's—it's not an evaluation. It's a condemnation."

They talked in that vein for about an hour, during which time Carlson repeated his belief Hall had lied about his November 16 activities (*id.* 93).

Hall asked Carlson for a lunch meeting March 8, but Carlson was busy and said he would be available the following week (*id.* 83; Carlson Dep. 247). Hall then met with Assistant Superintendent for Personnel John Lukancic ("Lukancic"), telling him Carlson was avoiding a meeting and "wanting me to squirm" (Hall Nov. Dep. 83). Hall told Lukancic he feared Carlson's evaluation would foreclose other job opportunities (*id.* 83–84). Hall continued (*id.* 84):

[Lukancic] assured me that if he were called, he would represent things objectively. And I told him I appreciated that, but at the same time I felt like Mr. Carlson had declared war on me. And if he wanted war, I would give him war. And at that point in time I left his office. I felt that Mr. Lukancic at that point decided that if indeed this was a war, he had to take sides. And I think he chose to take Mr. Carlson's side.

Hall and Carlson did meet March 14. From Hall's perspective that discussion was not productive (*id.*):

I told him point blank that I was in contempt of his base, mean tactics with me. And unless I was treated professionally, I would get legal representation.

And then I got legal representation.

On March 19 Carlson issued another memo to Hall, also titled "Your Administrative Performance" (Carlson Dep. Ex. 2, at 3–5). That memo was much more formal in style and organization, detailing criticisms of Hall's "administrative style and leadership," his "commitment to Romeoville High school" and his "personal relationship with me (assistant principal to principal)." Carlson's analysis purported to be based on his own observations as well

as those of the RHS staff. Under the "personal relationship" heading Carlson referred to "[t]he events of last November 9, 10, 16, and 19, 1984" but made no mention of Bryant or the wedding ring. Attached was an outline job description on which Hall's performance in eleven of thirteen applicable task categories was rated "satisfactory," with a "marginal" rating in the other two[6] (Carlson Dep. Ex. 2, at 7–8). Under ten categories of personal characteristics, Carlson rated Hall "satisfactory" in four, "marginal" in five and "unsatisfactory" in one: "Integrity" (*id.* at 8).

Carlson's March 19 memo formally announced he was recommending Board not renew Hall's contract (*id.* at 3). At the same time Carlson sent a copy of that memo to Lukancic, with a cover letter reading (*id.* at 2):

> I am recommending that the board of education issue a notice of non-renewal of administrative appointment to Dr. Jay T. Hall, RHS Assistant Principal.

As personnel administrator Lukancic's job was to take Carlson's recommendation, and as Lukancic put it in his Dep. 24, 26–27:

> then I have to determine what I think of the merits of that recommendation to decide whether or not I will forward that on to the board concurring with the recommendation or not.
>
> \* \* \* \* \* \*
>
> I feel it's my duty to make a judgment based upon what is presented.
>
> Q. Would you explain what you mean by make a judgment?
>
> A. I make a judgment. I have a hearing that I conduct, I ask people to explain their positions and to offer whatever they consider as evidence to support their position, and then I have to make a judgment based on that event.
>
> Q. Is your judgment whether or not the contract should be renewed?

A. Whether or not to support the recommendation.

On March 19 Lukancic told Hall he intended to conduct such a hearing March 20 (Lukancic Dep. Ex. 2, at 2). Hall appeared at the scheduled time and requested a continuance to allow him and his attorney time to respond to Carlson's evaluation. Hall agreed to appear at 3 p.m. March 22. On March 21 Hall told Lukancic that, on advice of counsel, he would not attend the March 22 hearing. Lukancic stated he would hold the hearing in any event. Hall then said he had a 4 p.m. appointment in Chicago on March 22, and Lukancic agreed to move the hearing up to 2 p.m. to accommodate Hall's schedule (*id.*).

Hall did not participate in the hearing. Just before it was scheduled to start, Hall handed Lukancic a note saying he could not appear because his attorney had advised him more preparation time was needed so that he could be "meticulous in [his] rebuttal" (*id.* at 1; Hall Nov. Dep. 107).

With a Board meeting scheduled for Monday March 25, Lukancic decided he could put the hearing off no longer (Lukancic Dep. 41). He therefore went ahead and took Carlson's testimony for over 3½ hours, directing Carlson to discuss his evaluation of Hall point-by-point and to (*id.* Ex. 6, at 1):

> provide as much specific information as possible about events and input from individuals that would support his evaluation of Dr. Hall.

On Saturday March 23 and again on Monday March 25 Lukancic phoned or personally spoke to several of the persons Carlson identified as sources of "input" (*id.*; Lukancic Dep. 37–38). He did not seek out the opinions of any RHS personnel who might have had a favorable opinion of Hall's work (Lukancic Dep. 39).

Shortly before the March 25 Board meeting Lukancic met with Hall and his attorney (*id.* 35). Hall asked Lukancic to

---

**6.** Those two were:

14. organize and schedule all special programs (assemblies, pictures, sales, field trips, etc.).

15. maintain necessary discipline standards so that meaningful education can take place.

present certain facts to Board,[7] and Lukancic agreed to give Board copies of any documents Hall submitted (*id.*). Hall's attorney asked Lukancic if he would be willing to call Carlson "to see if something could be worked out" (*id.*). Lukancic tried phoning Carlson but was unable to reach him (*id.*).

Lukancic presented his findings to Board in executive session March 25 (*id.* 61–62). In addition he submitted his handwritten notes of the March 22 hearing and the documents tendered by Hall (*id.* 62–63). What Lukancic told Board was (*id.* 66–67):

based on what I heard in the hearing and subsequent phone calls and so forth, I made a judgment that there was a sufficient amount of reason there to recommend non-renewal.

And his formal written findings (*id.* Ex. 6) said Hall:

1. used "intimidation" in dealing with staff members;

2. did not always give the necessary amount of thought to "planning activities and acting on requests";

3. was unable to "develop genuine relationships" with staff members;

4. was not as productive a member of the "administrative team" as was needed;

5. was not "open and honest" about the November 9, 10, 16 and 19, 1984 events; and

6. had a personal relationship with Carlson so poor "that it would be impossible for them to function appropriately on the same administrative team...."

No reference was made to Hall's relationship with Kay Bryant.

Board met with Lukancic for 10 or 15 minutes (Lukancic Dep. 66). Board members had previously received a packet of documents—including Carlson's written memos evaluating Hall—and there was little further discussion of Hall's performance (Jascewsky Dep. 61). No mention was made in Board discussion of the Hall-Bryant marriage (*id.* 62). All Board members present (one member was absent) voted in favor of nonrenewal (*id.* Ex. 10, at 16).

Hall—through his attorney—wrote Board April 25, 1985 requesting reconsideration. That letter (Complaint Ex. C) suggested Hall could show:

1. Carlson's evaluation of Hall's performance was "replete with erroneous and untruthful allegations."

2. Hall in fact had "fully performed his administrative duties and responsibilities in a professional manner."

3. Hall was never given an opportunity to "remediate" his job performance in any event.

*Earlier Proceedings in This Action*

Nothing having come of the letter, Hall filed this lawsuit, pegging federal subject-matter jurisdiction on the theory his dismissal was (¶ 27):

for the purpose and intent of retaliating against Hall for exercising his marital association rights guaranteed to all U.S. citizens like Hall under the First and Fourteenth Amendments to the United States Constitution.

This Court dismissed that claim against all defendants save Carlson because the Complaint alleged nothing more than *Carlson's* objection to the Hall-Bryant marriage: Because nothing in the material Carlson placed before Board gave any indication of his own claimed anti-marriage motivation, Opinion at 4 pointed out the Complaint really alleged Board was "hoodwinked" by Carlson into firing Hall. And that negated any claim Board had acted out of an unconstitutional motivation.[8]

But as to Carlson himself, Opinion at 6 (emphasis in original) said:

As for Carlson, at least a threshold consideration of the Complaint does not re-

---

7. Nothing in the record submitted on the current motion indicates what Hall asked Lukancic to place before Board.

8. This Court declined to exercise pendent-party jurisdiction over Hall's state-law claims against Board (Opinion at 5).

lieve him from possible liability. Even though he was not himself the decision-maker, his conduct could—on the broad view mandated by *Hishon [v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984) ]—perhaps be shown to be *a* (though not *the*) proximate cause of Hall's nonrenewal.

Discovery proceeded, and Carlson's current motion was filed and briefed by the parties.

### Contentions of the Parties

Hall has never claimed a deprivation of "procedural" due process. It was simply out of an abundance of caution that Opinion at 3 showed why in any event the Complaint did not make out that sort of constitutional claim.[9]

Thus the nub of Hall's federal cause of action remains his contention he was let go as a direct result of his exercising his constitutional right to marry the person of his choice. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 283–84, 97 S.Ct. 568, 574–75, 50 L.Ed.2d 471 (1977) provides the analytical framework for his claim:

> Doyle's claims under the First and Fourteenth Amendments are not defeated by the fact that he did not have tenure. Even though he could have been discharged for no reason whatever, and had no constitutional right to a hearing prior to the decision not to rehire him, *Board of Regents v. Roth,* 408 U.S. 564 [92 S.Ct. 2701, 33 L.Ed.2d 548] (1972), he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms. *Perry v. Sindermann,* 408 U.S. 593 [92 S.Ct. 2694, 33 L.Ed.2d 570] (1972).

Carlson's motion raises four arguments against that claim, the first three being directed to the causation problem already highlighted by the Opinion:

1. No evidence exists to support the claim Carlson's actions were motivated by opposition to the Hall-Bryant marriage.

2. By March 1985 Hall's attitude toward Carlson had deteriorated so badly as to constitute a separate, distinct and constitutionally immune basis for nonrenewal.

3. Board's action was triggered by Lukancic's recommendation, and that recommendation was based on Lukancic's own independent investigation of Hall's job performance.

Carlson's fourth contention is this is a "trivial personality dispute" of no constitutional dimension in *Mt. Healthy* terms.

None of those contentions survives analysis. Discussing them requires considerably less space than it has taken to set the factual framework (even though the legal discussion compels some brief review of the same facts).

### Causation

Causation is a function of facts linked by logic. Carlson is entitled to summary judgment on causation grounds if and only if each of two conditions is met:

1. There are no disputed issues of fact going to causation.

2. Logic as applied to the undisputed facts does not link cause and effect.

Unlike Ulysses, Carlson avoids neither Scylla nor Charybdis.

First, there is of course evidence Carlson was opposed to the Hall-Bryant marriage. On November 6, 1984 Carlson told Hall to "quit seeing Kay Bryant." His response to the couple's November 13 wedding an-

---

9. Opinion at 3 found Hall did not have a "property" interest in his public employment because he was nontenured (see Ill.Rev.Stat. ch. 122, ¶ 24–11). Hall Mem. 9 fully accepts that ruling's correctness. Opinion at 3 also went on to say the Complaint stated no claim for deprivation of a "liberty" interest: Hall did not allege (1) public dissemination of his asserted adminis-

trative failings or (2) the "stigma-plus" factor *Bishop v. Wood,* 426 U.S. 341, 348–50, 96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684 (1976) equated with a deprivation of liberty. Consistently with his failure to raise that claim in the Complaint, Hall's current briefing does not challenge that ruling either.

nouncement was "abrupt and sullen." When Smith came to RHS November 10 looking for Hall, Carlson called Bryant's mother though Smith says she asked him not to. Hall not unreasonably saw that as a form of intimidation. Carlson's reaction to the Hall-Bryant wedding ring was "apprehensive and agitated." Nor did Carlson join in the couple's wedding cheer: He was at pains to point out his wife—not he—had sent a wedding gift.

Carlson seeks to blunt the effect of those incidents by pointing out only the November 6 conversation and November 10 phone call were initiated by him. But so what? Carlson's *reactions* are as much evidence of his motives as his *actions*. Because motive and intent (at least improper ones) are rarely proved by direct statements,[10] they must almost always be inferred from conduct and circumstantial evidence (*Egger v. Phillips*, 710 F.2d 292, 320 (7th Cir. 1983) ). *Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1218 (7th Cir.1980) (per curiam) states the relevant summary-judgment rule:

> Summary judgment is improper in a discrimination case—or any other—if it involves—as it often must—any weighing of conflicting indications of motive and intent.

It is not now open to Carlson to say Hall's evidence isn't very strong or that it might also be characterized—pace Carlson—as an indication of "paternalistic concern" for Hall's welfare (Carlson Mem. 8). It *is* enough to say the evidence generates a reasonable inference Carlson was hostile to the marriage. Carlson Mem. 8 suggests the absence of nail-in-the-coffin evidence (such as a flat statement Hall must stop seeing Bryant as a condition of continued employment). But Hall's inability to produce that hypothetical best evidence does not entitle Carlson to summary judgment. Only if Hall had "turned up *no evidence* of an essential element of his case" would that result be proper (*Backes v. Valspar*

*Corp.*, 783 F.2d 77, 78–79 (7th Cir.1986) (emphasis added).

Here Hall has produced more than a little evidence of Carlson's hostility to the Hall-Bryant relationship, coupled with Carlson's November 19 statement (made in the context of Carlson's first significant criticism of Hall's work performance) that the relationship was "damaging" to Hall's position and to Carlson. Carlson has not passed the "no evidence" test.

Carlson's second causal attack is equally empty. No doubt by March 1985 the Hall-Carlson relationship had deteriorated badly. Lukancic believed the two no longer could "function appropriately on the same administrative team." And Hall does not dispute that such a poor relationship could in itself form a legitimate and constitutionally permissible basis for nonrenewal of his contract.

But Hall correctly says Carlson's argument mistakes effect for cause: Carlson's hostility to the Hall-Bryant relationship started the ball rolling, and Hall was swept up by its inertia. *Sprague v. Fitzpatrick*, 546 F.2d 560, 564–66 (3d Cir.1976), cited by Carlson, is inapposite here. There Sprague (a first assistant district attorney) essentially called his boss (the district attorney) a liar to the press. Sprague was discharged. He sued his former boss under Section 1983, claiming he was fired in retaliation for exercise of his First Amendment right of free expression (546 F.2d at 562). But the court held the First Amendment does not prohibit discharge of a public employee whose criticism of an immediate superior "totally precluded any future working relationship" (546 F.2d at 565) between the two. See also *Egger*, 710 F.2d at 322–23 (First Amendment does not prohibit transfer of FBI agent whose good-faith accusations of malfeasance against fellow employees result in total loss of his job effectiveness).

Hall does not claim his right to criticize Carlson was protected by the First Amend-

---

**10.** At least people who are aware they are acting for impermissible reasons usually seek to conceal them.

ment. Instead he asserts a constitutional right to associate with and marry the woman of his choice. Having exercised that right, Hall says Carlson began a campaign of retaliation, goading him on through criticism and trying to make him "squirm." That goading, in Hall's view, was the cause of their deteriorated work relationship.

*Sprague* and *Egger* (like *Pickering v. Board of Education of Township High School District 205, Will County,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), on which those cases relied) saw the need to strike a balance between a public employee's exercise of the First Amendment right to criticize a public employer and the real exigencies of an employment relationship.[11] Here neither side suggests the issue involves weighing Hall's *right to marry* against his employer's legitimate concerns. What Hall correctly asserts is the existence of a factual question as to whether his own responsive hostility was provoked by an unconstitutional course of action: Carlson's opposition to the marriage.

Put another way, Hall says the trier of fact must decide whether the deteriorated relationship was indeed an *independent* reason for not renewing his contract or whether it was part and parcel of the allegedly unconstitutional retaliation program. Carlson's argument suggests an employer can wrongfully drag an employee to the brink and then legitimately push him over the precipice when the employee fights back. That just won't go.

Carlson's final causation argument addresses this Court's proximate-cause question posed in Opinion at 6. Plainly Hall's contract was not renewed because Board (which had the authority to make such decisions) decided not to do so. Carlson was not the decisionmaker, nor did he appear before Board to urge his point of view. In the immediate sense Board acted on Lukancic's recommendation, which was based on facts Lukancic gathered for himself at the hearing he conducted and through followup

phone calls. Carlson would thus have it Lukancic was a supervening cause, breaking the chain linking Carlson with Board's action.

But that argument again does not realistically come to grips with the facts. Before this opinion turns to explaining why that is so, one response by Hall that does *not* answer Carlson's contention should be dealt with briefly.

Hall suggests there is a factual question as to whether Carlson was the de facto final decisionmaker as to Hall's contract status. Were that so, the causation question would have to be resolved in Hall's favor (*Wilson v. Taylor,* 733 F.2d 1539, 1546 (11th Cir.1984)). But there is no evidence suggesting Carlson had that power, with Board merely a rubber stamp:

1. Hall has tendered nothing suggesting Board had the power to overrule Carlson but never did so as a practical matter (see *Bowen v. Watkins,* 669 F.2d 979, 989 (5th Cir.1982)).

2. Hall has also offered nothing tending to show Board's procedures prevented adequate and full consideration of his case. True enough, he did not appear before Lukancic or Board, but that was (at least as to Lukancic) his own choice. Nothing about the procedures themselves suggests they are inadequate to do more than rubber-stamp a principal's recommendation or that such must be the inevitable result.

That approach, then, is a blind alley for Hall.

But what the facts *do* show is:

1. Carlson was responsible for setting the process in motion. Neither Board nor Lukancic acted sua sponte. In Lukancic's terms, the hearing is "precipitated" by a recommendation for nonrenewal (Lukancic Dep. 30). Of course Carlson (as Hall's supervisor) was required to make some kind of recommendation in any case, but Carlson provided the agen-

---

11. *Pickering,* 391 U.S. at 569–70, 88 S.Ct. at 1735–36, on a different set of facts, struck a different balance from that in *Sprague* and *Eg-* *ger,* upholding the employee's right to criticize those not in close working proximity.

da for this particular series of events. If his nonrenewal recommendation were based on unconstitutional motivation (already shown to be a reasonable inference), it is also reasonable to infer he would have set a different agenda absent that motivation.

2. Lukancic's investigation was keyed to Carlson's agenda. His role was to find evidence "that would support [Carlson's] evaluation of Dr. Hall." And of course Carlson was his principal source of information. In other words, Lukancic's hearing was not a de novo inquiry into Hall's fitness to serve as assistant principal. As Lukancic portrayed his role, he was not to second-guess Carlson, but was rather merely to double-check that Carlson's recommendation was not significantly off-base. He phoned RHS staff only to verify what Carlson said they said. He sought no other information about Hall's work.[12] That is not to say Lukancic was unfair or just a rubber-stamp. But his review of Carlson's recommendation was (in appellate-court terms) for plain error, not de novo. And that standard gives Carlson's recommendation a great deal of causal impact.[13]

3. Board in any case was not insulated from Carlson's direct input. Board members received a packet of literature concerning Hall, and that packet included Carlson's two memos evaluating Hall.

To the extent Board members may have relied on that information, they were exposed directly to the product of Carlson's allegedly tainted motivation.[14]

Given those factors, it is not unreasonable to draw the pro-Hall inference that Carlson (as Opinion at 4 put it) "hoodwinked" Lukancic and Board into recommending and acting upon Hall's nonrenewal—that Hall was thrust into a game whose dice were loaded against him by Carlson. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576 said plaintiff must show defendant's unconstitutional animus was a "substantial" or "motivating" factor in the adverse employment decision. It need not be the last act officially necessary to seal the result, or the final straw that broke the camel's back. It must always be remembered (Opinion at 6) the test is "*a* proximate cause," not "*the* proximate cause"—the familiar "but for" test. With reasonable inferences drawn in Hall's favor, Carlson was "*a* proximate cause" of the result—and a substantial one.

Once again that is not the only rational view of the facts. But it is a reasonable one, and it bars summary judgment on that score.

*Unconstitutional Animus*

Even on the assumptions that Carlson was opposed to the Hall-Bryant marriage

---

**12.** Carlson says it was Hall's obligation to present his own side of the story. To be sure, had Hall appeared at the hearing Lukancic would have heard Hall's version. That, however, does not address the real question: what Lukancic would have done with that information. As Lukancic described his mission, he was not to weigh Carlson's and Hall's testimony equally. Instead, he was to look for evidence supporting Carlson's view of things. On that approach, all that mattered was reaching critical mass on Carlson's side of the balance, regardless of what was on Hall's side. Thus Lukancic's March 25, 1985 findings (his Dep. Ex. 6) are replete with statements about "evidence to support Mr. Carlson's contention[s]." Those findings led to his conclusion recommending Hall's nonrenewal.

**13.** Nothing this opinion has said about Lukancic's hearing should be read to imply that sort of hearing is improper. There may obviously be

good reasons why significant deference should be given to a principal's recommendations as to a subordinate. Only the causation question is at issue here.

**14.** In an odd way, Carlson's own argument defeats him (Mem. 4):

Defendant respectfully suggests that since it was Lukancic's recommendation for non-renewal, which was arrived at by his own hearing which Hall chose not to attend, that an unconstitutional animus by Carlson, if any, was so attenuated that it was not a substantial factor in Lukancic's determination which was the basis of the Board's action.

To speak of "substantial factor" in that sense confirms that what is involved is a weighing of evidence—impermissible on a summary judgment motion. *Anderson,* —— U.S. at ——, ——, 106 S.Ct. at 2512–14. Remember, *Mt. Healthy* held the District Court had applied the wrong legal standard *after a trial.*

and that he vented that opposition on Hall by seeing his contract was not renewed, it would still be open to Carlson to contend no constitutional right was infringed. And his Mem. 9–11 tries to do so. But his argument is addressed solely to the adequacy-of-hearing issue the Opinion and this opinion's n. 9 have already said was irrelevant to the firing of a nontenured public employee. Hall does not assert a property or liberty interest: Instead he says the Constitution gives him the right to marry as he pleases, and he cannot be denied or deprived of public employment for exercise of that right.

Indeed, *Zablocki v. Redhail,* 434 U.S. 374, 383–86, 98 S.Ct. 673, 679–81, 54 L.Ed.2d 618 (1978); *Carey v. Population Services International,* 431 U.S. 678, 684–85, 97 S.Ct. 2010, 2015–16, 52 L.Ed.2d 675 (1977); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974); *Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973); *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1823–24, 18 L.Ed.2d 1010 (1967); *Griswold v. Connecticut,* 381 U.S. 479, 486, 85 S.Ct. 1678, 1682–83, 14 L.Ed.2d 510 (1965); and *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942) all teach (in *Skinner*'s terms) the right (sometimes called the freedom) to marry is one of the "basic civil rights of man."[15] See also *Littlejohn v. Rose,* 768 F.2d 765, 768–70 (6th Cir.1985) and *Newborn v. Morrison,* 440 F.Supp. 623, 626–27 (S.D.Ill.1977) (each upholding a plaintiff's constitutional cause of action on facts similar to those here). Hall says Carlson really caused Hall to lose his job because he married Bryant. It has long been established a public employer may not force a public employee to choose between continued employment and exercise of a constitutional right (*Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–35 and cases cited). That is what Hall says hap-

pened here. Nor is any colorable public interest served by allowing high-school principals to exercise veto power over assistant principals' spouses.

This case may indeed involve only a "trivial personality dispute"—though loss of employment is rarely trivial. But that is a factual question going to Carlson's actual motivation. If he thought he had the power to tell Hall whom to marry, he was wrong.

### Conclusion

There are indeed genuine issues of material fact as to (1) Carlson's motivation in recommending Hall's nonrenewal and (2) the degree of impact that recommendation had on Board's final decision not to renew. Carlson's summary judgment motion is therefore denied.

---

15. As with the right to travel (see *Attorney General of New York v. Soto-Lopez,* —— U.S. ——, —— - ——, 106 S.Ct. 2317, 2320–22, 90 L.Ed.2d 899 (1986); *id.* at ——, 106 S.Ct. at 2329 (O'Connor, J., dissenting)) the source of the "right to

marry" has never been placed precisely in the constitutional firmament. This opinion's string citations (normally eschewed by this Court) are reflective of the repeated (albeit nonspecific) Supreme Court references to that right.