

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-2-2001

# Baldassare v. County of Bergen

Precedential or Non-Precedential:

Docket 00-5263

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Baldassare v. County of Bergen" (2001). *2001 Decisions.* Paper 97.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/97

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 2, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-5263

MARK G. BALDASSARE,
        Appellant

v.

THE STATE OF NEW JERSEY; COUNTY OF BERGEN;
COUNTY OF BERGEN BOARD OF CHOSEN
FREEHOLDERS; OFFICE OF THE PROSECUTOR;
CHARLES R. BUCKLEY, under color of state law,
individually and in his capacity as Acting Pr osecutor for
Bergen County; JOHN and JANE DOE 1-10, individually
in their official capacities

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action No. 95-cv-06460
(Honorable Katharine S. Hayden)

Argued December 13, 2000

Before: SCIRICA and AMBRO, Circuit Judges,
and POLLAK, District Judge*

(Filed: May 2, 2001)

_____

* The Honorable Louis H. Pollak, United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

LINDA B. KENNEY, ESQUIRE
 (ARGUED)
NANCY S. MARTIN, ESQUIRE
Kenney, Schaer & Martin
The Galleria, Two Bridge Avenue
Atrium Building No. 5, Second Floor
Red Bank, New Jersey 07701

 Attorneys for Appellant

BARBARA H. PARKER, ESQUIRE
Office of County Counsel
Administration Building
Court Plaza South
21 Main Street
Hackensack, New Jersey
 07601-7000

 Attorney for Appellee,
County of Bergen

J. SHELDON COHEN, ESQUIRE
 (ARGUED)
PETER A. TUCCI, JR., ESQUIRE
DeCotiis, Fitzpatrick, Gluck, Hayden
 & Cole
Glenpointe Centre West
500 Frank W. Burr Boulevard
Teaneck, New Jersey 07666

 Attorneys for Appellees,
Office of the Prosecutor and
Charles R. Buckley, Acting
Prosecutor for Bergen County

DENNIS G. HARRAKA, ESQUIRE
Greenberg, Ferrara, Covitz, Turitz,
 Harraka & Goldberg
505 Main Street
Hackensack, New Jersey 07601

 Attorney for Appellee,
Board of Chosen Freeholders of
Bergen County

OPINION OF THE COURT

SCIRICA, Circuit Judge.

The Bergen County Prosecutor demoted and later fired one of his investigators allegedly for his r ole in an investigation of fellow law enforcement officers. The principal issue on appeal is whether the investigator's

dismissal violated his First Amendment rights. Holding the prosecutor's interest in an efficient workplace outweighed the investigator's interest in his speech, the District Court granted summary judgment for the prosecutor and related state entities on the First Amendment claim and declined exercising supplemental jurisdiction over his r emaining state law claim.1 For reasons that follow, we will reverse in part, affirm in part, vacate in part, and r emand.2

_____

1. The District Court had jurisdiction under 28 U.S.C. S 1331 and 42 U.S.C. SS 1983, 1988, and supplemental jurisdiction over the state claims under 28 U.S.C. S 1367. We have jurisdiction under 28 U.S.C. S 1291 because the District Court order disposed of all federal claims.

We exercise plenary review over the District Court's grant of summary judgment. Latessa v. N.J. Racing Comm'n, 113 F.3d 1313, 1317 (3d Cir. 1997). In conducting our review, we view the r ecord in the light most favorable to the party opposing the motion and draw all reasonable inferences in his favor. Fogarty v. Boles, 121 F.3d 886, 887 (3d Cir. 1997); Azzaro v. County of Allegheny, 110 F.3d 968, 970 (3d Cir. 1997) (en banc). This court must make an " `independent constitutional judgment on the facts of the case' " as to whether the speech involved is constitutionally protected. Connick v. Myers, 461 U.S. 138, 150 n.10 (1983) (quoting Jacobellis v. Ohio, 378 U.S. 184, 190 (1964) (opinion of Brennan, J.)); Watters v. City of Philadelphia, 55 F.3d 886, 891 (3d Cir. 1995).

2. The District Court also held that plaintif f 's suit under New Jersey's Conscientious Employee Protection Act waived all other related state law claims. We will affirm.

I.

FACTS

In 1983, Mark Baldassare commenced working at the Bergen County Prosecutor's Office as an agent; in 1984 he was promoted to investigator; and in 1989 he was promoted to Lieutenant of Investigators and Director of the Computer Division.3 Over the years, Baldassare received several promotions culminating in his appointment in January 1995 as Acting Chief of Investigators by the Ber gen County Prosecutor, John Fahy.

The incident that sets the stage for this lawsuit took place in 1994 when allegations of criminal activity began to circulate within the Bergen County Pr osecutor's Office. At a disciplinary hearing of Senior Investigator Richar d Barbato, his attorney accused Deputy Chief Ed Denning and Lieutenant Mike Carlino of a "car scam"--buying previously leased county vehicles well below market price. Baldassare reported these allegations to First Executive Assistant Robert Hennessey and Prosecutor Fahy, who later instructed Baldassare to ascertain whether the cars owned by Denning and Carlino had been previously leased by the County. After determining the vehicle identification numbers matched, Prosecutor Fahy instructed Baldassare to perform an internal investigation into the allegations against Denning and Carlino. At its conclusion, Pr osecutor Fahy decided Denning and Carlino should be char ged criminally and authorized a complaint. Because of a conflict of interest, Prosecutor Fahy turned the matter over to the New Jersey Attorney General. But after investigating, the Attorney General's Criminal Division dismissed the charges for lack of evidence of criminal intent.4  Despite the Attorney

_____

3. We review the facts in the light most favorable to the nonmoving party. For this reason, we will present Baldassar e's version of the events leading up to his dismissal.

4. In a memo on the Denning and Carlino matter , a New Jersey Deputy Attorney General concluded:

> Upon a thorough review of all available evidence in this matter,
> including over 30 witness interviews, analysis offiles and

4

General's decision, Prosecutor Fahy brought administrative charges of wrongdoing against Denning and Carlino. As a result, both were suspended without pay. Denning chose to retire.

On February 28, 1995, Deputy Attorney General Charles Buckley questioned Baldassare about his r ole in the Denning and Carlino investigation. Buckley allegedly told Baldassare that Denning and Carlino wer e friends and that criminal charges should not have been pursued. He then allegedly asked Baldassare to name all those involved in the investigation, noting his unhappiness that "two good men's careers had been ruined."

The following day, Prosecutor Fahy resigned and Buckley became Acting Prosecutor for Bergen County. Baldassare contends it soon became clear that Buckley held him responsible for the officers' punishment, and began engaging in "rude, disrespectful and r etaliatory conduct."

Buckley subsequently demoted Baldassare two levels from Acting Chief of Investigators to Captain; transferred him to the Bergen County Police Academy; and prohibited him from further contact with the Bergen County Prosecutor's Office Computer Division which he previously managed. Baldassare also contends Buckley sear ched for evidence that would cast him in an unfavorable light. The

_____

> documents produced by Bergen County, the BCPO and BCNTF, ALCO, and GMAC and particularly in light of the internal procedures existing at BCPO and BCNTF , it is respectfully recommended that this office decline pr osecution in this matter based upon the lack of criminal intent sufficient for a successful prosecution.
>
> As set forth above the theft and misconduct char ges are not supported by the evidence. . . . It is further r ecommended that a more appropriate remedy for the defendants' actions be to refer this matter for any and all administrative action that the BCPO would deem appropriate.

Memorandum from Frank J. Brady, Jr., Deputy Attorney General, Corruption/Antitrust Division to Terrence P. Farley, Director, and Michael Bozza, Deputy Director, Department of Law and Public Safety for the State of New Jersey's Division of Criminal Justice (October 24, 1994).

matter came to a head, Baldassare charges, when Buckley terminated him with neither notice nor cause on October 10, 1995.

Buckley maintains that after assuming office as Acting Prosecutor, he realized Baldassar e was not qualified to serve as Acting Chief of Investigators. Buckley's defense details Baldassare's dearth of qualifications and errors, which include making false accusations, mishandling a murder and an organized crime investigation, and attempting to cover-up the improper discharge of his firearm. Moreover, Buckley insists that Baldassare was insubordinate and exhibited an unhelpful attitude. For these reasons--and not for retaliatory purposes--Buckley professes he demoted Baldassare fr om Acting Chief of Investigators to Captain and assigned him to the Police Academy in June 1995. When Baldassare purportedly failed to adjust his poor attitude and adequately per form his duties, Buckley fired him.

II.

PROCEDURAL HISTORY

Baldassare sued Buckley, Bergen County, the Bergen County Prosecutor's Office, the State of New Jersey and the County of Bergen Board of Chosen Fr eeholders under 42 U.S.C. S 19835 for violating his procedural and substantive due process rights by "fail[ing] to allow him to exercise his freedom of speech in speaking out about various public issues and/or in exercising his role as Captain of the

_____

5. Title 42 U.S.C. S 1983 provides:

Every person who, under color of any statute, or dinance, regulation,
custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the
deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress
. . . .

42 U.S.C. S 1983.

6

County Prosecutor's Office when he investigated and reported other officers for their violation of the law and public policy." Baldassare also brought state law claims-- breaches of contract, violation of New Jersey's Conscientious Employee Protection Act ("CEP A"), N.J. Stat. Ann. SS 34:19-1 to -8, and violations of the New Jersey Constitution.

Defendants filed motions to dismiss. The District Court dismissed Baldassare's Fifth and Fourteenth Amendment due process claims and his CEPA claim against the State of New Jersey on sovereign immunity grounds. After discovery, the District Court granted defendants' motion for summary judgment and declined to exercise supplemental jurisdiction over the state law CEPA violation. Baldassare appeals the grant of summary judgment on his claims brought under 42 U.S.C. S 1983 for violation of his First Amendment rights, tortious violation of his state constitutional right to freedom of speech, and tortious interference of economic advantage.

III.

FIRST AMENDMENT

A public employee has a constitutional right to speak on matters of public concern without fear of r etaliation. Rankin v. McPherson, 483 U.S. 378, 383-84 (1987); Feldman v. Phila. Hous. Auth., 43 F.3d 823, 829 (3d Cir. 1994) ("A state cannot lawfully discharge an employee for r easons that infringe upon that employee's constitutionally pr otected interest in freedom of speech."). Public employers cannot silence their employees simply because they disappr ove of the content of their speech. Rankin, 483 U.S. at 384; Watters, 55 F.3d at 891. While"the government's role as employer . . . gives it a freer hand in r egulating the speech of its employees than it has in regulating the speech of the public at large," this hand cannot act with impunity. Waters v. Churchill, 511 U.S. 661, 671 (1994) (plurality opinion); Watters, 55 F.3d at 895-96.

A public employee's retaliation claim for engaging in protected activity must be evaluated under a three-step

process. Green v. Phila. Hous. Auth. , 105 F.3d 882, 885 (3d Cir. 1997); Pro v. Donatucci, 81 F.3d 1283, 1288 (3d Cir. 1996). First, plaintiff must establish the activity in question was protected. Holder v. City of Allentown , 987 F.2d 188, 194 (3d Cir. 1993). For this purpose, the speech must involve a matter of public concern. Connick, 461 U.S. at 147; Watters, 55 F.3d at 892. Once this threshold is met, plaintiff must demonstrate his interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees. Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968) (requiring courts to strike"a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it perfor ms through its employees"); Azzaro, 110 F.3d at 976; Green, 105 F.3d at 885. These determinations are questions of law for the court. Waters, 511 U.S. at 668; Green, 105 F.3d at 885.

If these criteria are established, plaintif f must then show the protected activity was a substantial or motivating factor in the alleged retaliatory action. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Watters, 55 F.3d at 892; Swineford v. Snyder County Pa., 15 F.3d 1258, 1270 (3d Cir. 1994). Lastly, the public employer can rebut the claim by demonstrating "it would have r eached the same decision . . . even in the absence of the pr otected conduct." Doyle, 429 U.S. at 287; Swineford, 15 F.3d at 1270 (citing Czurlanis v. Albanese, 721 F .2d 98, 103 (3d Cir. 1983)). The second and third stages of this analysis present questions for the fact finder and ar e not subject to review in this case. Green, 105 F.3d at 889 (recognizing second and third steps in Pickering/Mt. Healthy analysis are questions for fact finder); see also Watters, 55 F.3d at 892 n.3; Zamboni v. Stamler, 847 F.2d 73, 79 n.6, 80 (3d Cir.) (noting whether protected activity acted as substantial or motivating factor in discharge and whether same action would have been taken regardless ar e questions for jury), cert. denied, 488 U.S. 899 (1988); Johnson v. Lincoln Univ., 776 F.2d 443, 454 (3d Cir. 1985) (holding "second and third questions . . . should be submitted to the jury").

8

A.

MATTER OF PUBLIC C ONCERN

Our initial inquiry trains on whether Baldassar e's conduct in the investigation qualifies as a matter of public concern. Connick, 461 U.S. at 146; Swineford, 15 F.3d at 1270-71. "A public employee's speech involves a matter of public concern if it can `be fairly considered as relating to any matter of political, social or other concer n to the community.' " Green, 105 F .3d at 885-86 (quoting Connick, 461 U.S. at 146). In this respect, we focus on the content, form, and context of the activity in question. Connick, 461 U.S. at 147-48; Watters, 55 F .3d at 892. The content of the speech may involve a matter of public concer n if it attempts "to bring to light actual or potential wr ongdoing or breach of public trust on the part of government officials." Holder, 987 F.2d at 195 (internal quotations and citation omitted); see also Swineford, 15 F.3d at 1271 ("[S]peech disclosing public officials' misfeasance is protected."). The District Court ruled that Baldassare's conduct in the investigation constituted a matter of public concern. W e agree.

In Feldman v. Phila. Hous. Auth., 43 F .3d 823 (3d Cir. 1995), we recognized the compilation and distribution of a public auditor's report involved matters of public concern. The plaintiff, James Feldman, worked as the director of the Philadelphia Housing Authority's Internal Audit Department where he was responsible for unearthing and investigating corruption, fraud and illegality. As part of his duties, Feldman was required to share hisfindings with the agency's executive director and board of commissioners. When Feldman prepared a critical r eport aimed at improprieties in certain personnel decisions by the executive director and chairman of the board of commissioners, the executive director fir ed him before the report could be circulated. Alleging he was fired in retaliation for protected speech, Feldman brought suit under 42 U.S.C. S 1983 and Pennsylvania's"whistleblower" statute. We found his report satisfied the threshold requirement because "[t]he very purpose of his auditing reports was to ferret out and highlight any improprieties that he found at [the Pennsylvania Housing Authority].

9

Disclosing corruption, fraud and illegality in a government agency is a matter of significant public concer n." Feldman, 43 F.3d at 829.

It seems likely the scope of Baldassare's duties as a general investigator was broader than Feldman's. But the underlying issue is similar, namely, whether Baldassare's role in an internal investigation of alleged criminal wrongdoing by officials in the Bergen County Prosecutor's Office implicates First Amendment protection.

Defendants contend Baldassare perfor med his internal investigation of Officers Denning and Carlino in the normal course of his duties as an investigator at the instruction of Prosecutor Fahy. Because the report was pr epared as part of Baldassare's employment, defendants ar gue it does not satisfy the "matter of public concern" r equirement. In support, they rely on a decision by the Court of Appeals for the Eleventh Circuit which held statements made in a police accident report and related deposition did not constitute speech on a matter of public concer n. Morris v. Crow, 142 F.3d 1379 (11th Cir . 1998). Analyzing police reports in relation to matters of public concern, the Court of Appeals for the Eleventh Circuit stated:

> Police reports reflect information of general public interest and any information concer ning police conduct and public safety could be considered to r each matters of public interest. The fact that such infor mation may be of general interest to the public, however , does not alone make it of "public concern" for First Amendment purposes.

Morris, 142 F.3d at 1381.

We believe the comparison is inapt. In Morris, the court found the officer's report of a car accident and subsequent testimony did not constitute a public matter because the expression did not evince an attempt "to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." Morris, 142 F.3d at 1382 (citation and quotation omitted). Moreover , the court noted that the officer's professional duties r equired him to provide the information. It is undisputed that Baldassare was also required to perform his investigation. But even under the

10

Morris rationale, Baldassare's investigation would still constitute a matter of public concern because it attempted to expose " `specific wrongs and abuses within the county government.' " Morris, 142 F.3d at 1382 (quoting Warnockv. Pecos County, 116 F.3d 776, 780 (5th Cir . 1997)). Our jurisprudence makes clear that an internal investigation into the alleged criminal actions of public employees "falls squarely within the core public speech delineated in Connick." Swineford, 15 F .3d at 1271 (internal quotations and citation omitted); but see Gonzalez v. City of Chicago, 239 F.3d 939, 942 (7th Cir. 2001) ("Speech which is made in all respects as part of the employee's job duties is generally not the protected expression of the public employee.").

Defendants also stress the internal natur e of the investigation counsels against finding Baldassar e's conduct involves a public matter. But the inter nal character of the investigation is not necessarily significant, because our inquiry focuses on the nature of the infor mation, not its audience. We have recognized that

> the community's interest in the free exchange of information and ideas relating to matters of public concern is not limited to public declarations. That interest is implicated in [internal] exchanges . . . as well as in exchanges between an individual and members of the public. [Internal] dissemination of information and ideas can be as important to effective self-governance as public speeches. Thus, if the content and circumstances of a[n] [internal] communication are such that the message conveyed would be relevant to the process of self-governance if disseminated to the community, that communication is public concern speech, even though it occurr ed in a private context.

Azzaro, 110 F.3d at 977-78 (citing Connick, 461 U.S. at 146, 148); see also Rankin, 483 U.S. at 387 n.11 ("The private nature of the statement does not . . . vitiate the status of the statement as addressing a matter of public concern.") (citing Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 414-16 (1979)). It appears, therefor e, we have declined to distinguish between a public employee's

11

expression "as an employee" and a public employee's expression "as a citizen." Azzar o, 110 F.3d at 979. Instead, we concentrate on the value of the speech itself.

In Connick v. Myers, 461 U.S. 138 (1983), an assistant district attorney circulated a questionnaire in her office "to gather ammunition for another round of contr oversy with her superiors" in an effort to oppose a transfer. 461 U.S. at 148. Despite her personal motivation to derail her transfer, the questionnaire satisfied this threshold requirement because one question addressing pressur e to work in political campaigns raised a matter of public concer n. Likewise, Baldassare's motive for perfor ming the investigation is immaterial.

Baldassare's investigation sought " `to bring to light actual or potential wrongdoing or breach of public trust' " by the officers he investigated. Holder, 987 F.2d at 195 (quoting Connick, 461 U.S. at 148). "Needless to say, allegations of corrupt practices by government officials are of the utmost public concern." O'Donnell v. Yanchulis, 875 F.2d 1059, 1061 (3d Cir. 1989). For these reasons, we hold Baldassare's conduct and expression in the internal investigation of employees at the Bergen County Prosecutor's Office constituted a matter of public concern.

B.

BALANCING OF INTERESTS

We next turn to whether Baldassar e's free speech interest in his investigation is outweighed by any injury his conduct could cause the interests of the prosecutor as a public employer. Pickering, 391 U.S. at 568; Green, 105 F.3d at 887. In striking this balance, the public's inter est in the expression may be significant. O'Donnell , 875 F.2d at 1061. The public employer, furthermor e, bears the burden of justifying the discharge, which " `varies depending upon the nature of the employee's expression.' " Watters, 55 F.3d at 895 (quoting Connick, 461 U.S. at 150). Above all, no single factor involved in this balancing is dispositive; they are all " `weights on the scales.' " Zamboni, 847 F.2d at 79 (quoting Czurlanis, 721 F.2d at 107).

12

On the employee's side of this balance, the public's interest in exposing potential wrongdoing by public employees is especially powerful. We have made clear that "[s]peech involving government impr opriety occupies the highest rung of First Amendment protection. Mor eover, the public's substantial interest in unearthing governmental improprieties requires courts to foster legitimate whistleblowing." Swineford, 15 F .3d at 1274; see also Feldman, 43 F.3d at 829 ("The inter ests of [the auditor], as well as the public, in exposing governmental wrongdoing . . . [are] very strong."); O'Donnell, 875 F.2d at 1062 ("The public has a significant interest in encouraging legitimate whistleblowing . . . .").

Defendants suggest that Baldassare's conduct utterly destroyed "a needed close working relationship" with the chief prosecutor. Czurlanis, 721 F.2d at 106; see also Sprague v. Fitzpatrick, 546 F.2d 560, 565 (3d Cir. 1976), cert. denied, 431 U.S. 937 (1977). Because the r elationship between prosecutor and investigator demands trust and confidence, they argue, its wholesale disruption deprives Baldassare's expression of constitutional protection. With respect to the employer, we must consider "whether the [expression] impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the per formance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin, 483 U.S. at 388; O'Donnell, 875 F.2d at 1061. In calibrating the significance of the disruption, the relationship between the employer and the employee is particularly important. Sprague, 546 F.2d at 564. Specifically, we must look to the "[p]roximity within an organizational hierarchy [a]s a significant factor in the employer's demonstration that a public employee's speech had a detrimental impact on a necessarily close working relationship." Swineford, 15 F .3d at 1272-73 (holding county voter registrar's interest in comments regarding electoral improprieties did not outweigh the state's interest in efficiency when discharged); see also Zamboni, 847 F.2d at 79 (holding court must determine "whether [investigator's] functional role in the prosecutor's office was

13

of such proximity to [his employer] that his speech destroyed a needed close working relationship").

In this vein, defendants argue Baldassar e was terminated because his professional relationship with Buckley had completely deteriorated as a result of his r ole in the investigation. Citing Sprague v. Fitzpatrick, 546 F.2d 560, 565 (3d Cir. 1976), cert. denied, 431 U.S. 937 (1977), defendants contend the categorical disruption of a close working relationship effected by an employee's conduct is unprotected as a matter of law. In Sprague , the District Attorney of Philadelphia, F. Emmett Fitzpatrick, fired his First Assistant, Richard Sprague, after he sharply criticized the truth of public statements made by the District Attorney. In a criminal prosecution, First Assistant Sprague had been seeking a sentencing recommendation of two and a half to five years for a convicted criminal, Joseph Nardello. Subsequently, the District Attor ney intervened and recommended probation at Nardello's sentencing hearing. It was later discovered the District Attorney had previously represented Nardello's co-defendant and his motives for the recommendation were questioned. In several public declarations, the District Attorney maintained his office suggested the recommendation and/or a sentencing agreement had been made with Nardello by the previous District Attorney. When Sprague challenged the veracity of these public comments in an interview published in The Philadelphia Inquirer, he was fir ed.

In weighing the relevant interests, we found "[t]he crucial variant in [the Pickering] balance appears to have been the hierarchical proximity of the criticizing employee to the person or body criticized." Sprague, 546 F.2d at 564. Although we held Sprague's comments touched on important issues that fell within the purview of the First Amendment, the Pickering balance did not"tilt" in his favor because "the effectiveness of the employment relationship between employee-speaker and employer-tar get [was] so completely undermined." Id. at 565.

We find the reliance on Sprague  misplaced. Sprague voluntarily criticized and publicly admonished his employer for whom he acted as an "alter ego." W e found his actions completely destroyed a working relationship that was

14

dependent on mutual trust and confidence.6 Baldassare's demotion from Acting Chief Investigator to Captain and subsequent transfer to the police academy belie a comparison to the undoing of a "close working r elationship" in Sprague.7 Moreover, Baldassare was directed to perform

_____

6. We rested this conclusion on guidance we drew from the Supreme Court's earlier holding in Pickering. In Pickering, the Court held a high school teacher could not be dismissed for criticizing a school board's handling of financial issues in a letter to a local newspaper. In its opinion the Court presaged the questions raised in Sprague when it recognized that Pickering's

> statements [were] in no way directed towards any person with whom [he] would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here. [Pickering's] employment relationships with the Board and, to a somewhat lesser extent, with the superintendent ar e not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence ar e necessary to their proper functioning.

> * * *

> It is possible to conceive of some positions in public employment in which the need for confidentiality is so gr eat that even completely correct public statements might furnish a permissible ground for dismissal. Likewise, positions in public employment in which the relationship between superior and subor dinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them can also be imagined.

391 U.S. at 569–70, 570 n.3.

On this basis, we found that despite the "grave public import" of Sprague's comments, the Pickering balance leaned in the public employer's direction because "the ef fectiveness of the employment relationship between employee-speaker and employee-target [was] so completely undermined." Sprague, 546 F.2d at 565. "Indeed, the public uproar engendered by Sprague's pronouncements is precisely the factor that so thoroughly curtailed Sprague's usefulness as Fitzpatrick's deputy." Id.

7. Defendants also point out that under New Jersey law, investigators serve at the pleasure of the prosecutor . N.J. Stat. Ann. S 2A:157-10 (West 2000); Cetrulo v. Byrne, 157 A.2d 297, 300-01 (N.J. 1960).

15

the investigation by his employer, Pr osecutor Fahy, and he did not impugn the integrity of his superior . See id.; see also Roseman v. Ind. Univ. of Pa. at Ind., 520 F .2d 1364, 1368 (3d Cir. 1975) (upholding dismissal of First Amendment claim when speaker's expression "called into question the integrity of the person immediately in charge of running a department"), cert. denied, 424 U.S. 921 (1976). A similar relationship is not at issue here.

There is little doubt that Baldassare's investigation threatened to undermine the effectiveness of the prosecutor's office based on the "potential disruptiveness of the speech." Waters, 511 U.S. at 680. Furthermore, there is no doubt that Baldassare's role in the investigation impaired his working relationship with Buckley. Nonetheless, we have long recognized:

> The First Amendment balancing test [of Pickering] can hardly be controlled by a finding that disruption did [or could] occur. An employee who . . . exposes . . . corruption in her office no doubt may disrupt and demoralize much of the office. But it would be absurd to hold that the First Amendment generally authorizes . . . officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office . . . . The point is simply that the balancing test articulated in Pickering is truly a balancing test, with office disruption or breached confidences being only weights on the scales.

O'Donnell, 875 F.2d at 1062 (quoting Czurlanis, 721 F.2d at 107 (emphasis in original)); see also Feldman , 43 F.3d at 830 ("Exposing waste, fraud, and corruption within an agency will likely cause disruption, particularly when done by a person whose responsibility it is to unveil such conduct. This type of disruption however, cannot justify a retaliatory charge."). Under this view, Baldassare cannot be faulted in the Pickering analysis for disruption caused by an internal investigation into fellow officers.

Therefore, we hold that Baldassare's expression in his investigation is constitutionally protected. Because there is a strong public interest in uncovering wr ongdoing by public employees, his investigation involved a matter of public

16

concern. Because we find that Baldassar e's conduct involved a matter of significant public concer n and the state has failed to establish its interest outweighed its employee's, we find the District Court err ed in holding the expression was not protected by the First Amendment. Accordingly, we will reverse and r emand this matter to the District Court.

C.

UNRESOLVED ISSUES

There remain disputed issues as to the r easons for Baldassare's dismissal. If the fact finder concludes that Baldassare was discharged for his involvement in the investigation, defendants still have an opportunity to demonstrate they would have followed the same course of action.8 On remand, Baldassare bears the burden of establishing his protected conduct in his investigation of Denning and Carlino served as a substantial or motivating factor in his dismissal. Doyle, 429 U.S. at 287; Feldman, 43 F.3d at 829. Defendants can rebut this claim if they can demonstrate by a preponderance of the evidence Baldassare was terminated for other reasons. W atters, 55 F.3d at 892 (citing Doyle, 429 U.S. at 287).

_____

8. The Supreme Court ensured public employers would have this protection when it recognized:

> A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But the same candidate ought not be able, by engaging in such conduct, to prevent his employer fr om assessing his performance record and reaching a decision . . . [to terminatehis employment] on the basis of that recor d, simply because the protected conduct makes the employer mor e certain of the correctness of its decision.

Doyle, 429 U.S. at 286.

IV.

QUALIFIED IMMUNITY

Defendants insist they are immune under the doctrine of qualified immunity. Harlow v. Fitzgerald, 457 U.S. 800 (1982). The District Court mentioned this defense approvingly in its oral decision. But it r emains unavailing. Defendants assert that Baldassare's First Amendment rights against retaliation were not clearly established at the time Buckley chose to discharge him, citing Sprague, 546 F.2d 560, and Hooper v. Nacrelli , 512 F.Supp. 363 (E.D.Pa. 1981) (dismissing police chief 's complaint alleging infringement of his First Amendment rights when mayor demoted him). As noted, Sprague does not control the expression at issue. Defendants' argument that Baldassare's First Amendment rights wer e not clearly established cannot be sustained. See, e.g., Green v. Phila. Hous. Auth., 105 F.3d 882 (3d Cir . 1997) (holding voluntary court appearance by police officer constituted matter of public concern); Watters v. City of Philadelphia, 55 F.3d 886 (3d Cir. 1995) (holding police department could not dismiss employee for criticizing departmental program in newspaper article); Feldman v. Phila. Hous. Auth., 43 F.3d 823 (3d Cir. 1995) (holding housing authority could not dismiss public auditor for report detailing wrongdoing by housing authority officials); Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993) (holding city could not terminate city employee for criticizing public employment r esidency requirement in local newspaper); O'Donnell v. Yanchulis, 875 F.2d 1059 (3d Cir. 1989) (holding township could not dismiss police chief for protected speech); Czurlanis v. Albanese, 721 F.2d 98 (3d Cir. 1983) (holding county unlawfully discharged county mechanic for criticizing his department at public meetings). Some years ago, we recognized that "as of 1982 the law was`clearly established' that a public employee could not be demoted in r etaliation for exercising his rights under the first amendment." Zamboni, 847 F.2d at 80 n.7 (inter nal quotations and citation omitted).

Our decision rests solely on the protected status of Baldassare's conduct during his internal investigation. We

18

express no opinion as to any issue left for adjudication. In particular, we render no opinion on Baldassare's competency.9 Our holding is limited to whether an investigator's internal report of alleged wrongdoing by other officers is a matter of public concern that justifies First Amendment protection under the Pickering  balancing test.

V.

CEPA CLAIM

The District Court held that Baldassare's initiation of a retaliation claim under New Jersey's Conscientious Employee Protection Act ("CEPA") ef fected a waiver of his other state law claims, which were based on identical facts. Of these claims, Baldassare only appeals the waiver of his claims alleging tortious violation of his state constitutional right to freedom of speech and tortious inter ference with economic advantage. We will affirm.

We examine the state law claims in light of the statute's language and its interpretation by New Jersey courts. In 1986, the New Jersey legislature enacted CEP A to protect public employees who "blow the whistle" on governmental organizations or employees engaged in wr ongful conduct from retaliatory action.10 Abbamont v. Piscataway Township

_____

9. The question of Baldassare's competency is one for the fact finder. Feldman, 43 F.3d at 831 (holding "[employer's] attack on [employee's] alleged incompetence as the reason for his dismissal raised a jury issue").

10. The category of actions provided by the statute includes:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> a. Discloses, or threatens to disclose to a supervisor or to a public
> body an activity, policy or practice of the employer or another employer, with whom there is a business relationship, that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or , in the case of an employee who is a licensed or certified health car e professional, reasonably believes constitutes improper quality of patient care;

19

Bd. of Educ., 650 A.2d 958, 964 (N.J. 1994). As part of the statute, the state legislature included a waiver provision that provides:

> Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law or regulation or under any collective bargaining agreement or employment contract; except that the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under common law.

N.J. Stat. Ann. S 34:19-8.

The New Jersey Supreme Court has interpr eted the scope of this waiver provision and concluded:

> [O]nce a CEPA claim is "instituted," any rights or claims for retaliatory discharge based on a contract of employment; collective bargaining agreement; State

_____

> b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer or another employer, with whom ther e is a business relationship, or, in the case of an employee who is a licensed or certified health care professional, pr ovides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into the quality of patient car e; or
>
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or r egulation promulgated pursuant to law or, if the employee is a licensed or certified health care professional, constitutes impr oper quality of patient care;
>
> (2) is fraudulent or criminal; or
>
> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfar e or protection of the environment.

N.J. Stat. Ann. S 34:19-3.

law, whether its origin is in the Legislatur e, the courts, the common law or rules of the court; or regulations or decisions based on statutory authority, are all waived. The waiver exception contains a list of sour ces of law that may provide a bundle of rights protecting employees from retaliatory dischar ge. Parallel claims based on those rights, privileges and remedies are waived because they represent multiple or duplicative claims based on retaliatory discharge.

Young v. Schering Corp., 660 A.2d 1153, 1160 (N.J. 1995).

By contrast, the court found the waiver would not apply to "those causes of action that are substantially independent of the CEPA claim." Id. Because Baldassare's state law claims arise from the same set of facts surr ounding his retaliation claim, and CEPA prohibits litigating duplicative claims, we will affirm the order dismissing his other state law claims.

The District Court declined to exercise supplemental jurisdiction over Baldassare's remaining CEPA claim since the dismissal of his First Amendment claim disposed of all federal issues.11 But given our reversal of the grant of summary of judgment on Baldassare's retaliation claim under the First Amendment, we will vacate the District Court's order declining to exercise supplemental jurisdiction over his CEPA claim. We express no opinion on whether the District Court should exercise supplemental jurisdiction in this matter.

VI.

CONCLUSION

For the foregoing reasons, we will r everse the judgment of the District Court regarding the First Amendment protection accorded the plaintiff 's investigatory conduct,

_____

11. This claim alleges the defendants violated CEPA by improperly punishing Baldassare in response to his r ole in the investigation of Officers Denning and Carlino and the charges subsequently brought against them.

21

vacate the court's order declining jurisdiction over his CEPA claim, and remand for further proceedings consistent with this opinion. We will affirm the judgment of the District Court dismissing Baldassare's other tort claims.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

22