**Keith E. JOHNSON, Appellant,**

v.

**Andrew N. YURICK II; Gloucester County Board of Chosen Freeholders; James B. Cannon; Gloucester County Prosecutor's Office; County of Gloucester.**

No. 01–3598.

United States Court of Appeals, Third Circuit.

Argued April 8, 2002.

Filed June 26, 2002.

744

Harold B. Shapiro, (argued), Vineland, NJ, for appellant.

Jacqueline A. DeGregorio, (argued), Francis J. Vernoia, Weiner Lesniak, Parsippany, NJ, for appellees, Andrew Yurick II and Gloucester County Prosecutor's Office.

Michael Parlavecchio, (argued), Genova Burns & Vernoia, Livingston, NJ, for appellees, County of Gloucester, Gloucester County Board of Chosen Freeholders and James B. Cannon.

BEFORE: McKEE and BARRY Circuit Judges, and ALARCON,* Senior Circuit Judge.

## OPINION OF THE COURT

McKEE, Circuit Judge.

Keith Johnson appeals the district court's grant of summary judgment in favor of all of the defendants as to Johnson's free speech claims under the United States and New Jersey Constitutions.[1] The district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. For the reasons that follow, we will affirm. Since we write only for the district court and the parties who are familiar with the circumstances underlying the instant appeal, we need not recite the factual or procedural background of this dispute except insofar as may be necessary to our brief discussion.[2]

---

* The Honorable Arthur L. Alarcon, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

1. Because New Jersey courts "rely upon federal constitutional principles in interpreting the free speech clause of the New Jersey Constitution," *Karins v. City of Atlantic City,* 706 A.2d 706, 713 (N.J.1998), our analysis of

Johnson's First Amendment free speech claim applies equally to his free speech claim under the New Jersey Constitution.

2. The fact surrounding this case have been set forth thoroughly in the opinion of the district court. *See Johnson v. Yurick,* 156 F.Supp.2d 427 (D.N.J.2001). In addition, we will not discuss Johnson's due process or equal pro-

We will limit our discussion to whether the district court erred under *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and its progeny, in concluding that Yurick's interest in an efficient workplace outweighed Johnson's free speech rights.[3]

In *Pickering*, the Supreme Court addressed the conflict between government as employer and a public employee's right to free speech. In resolving that tension, the Court stated that, "the problem in any case is to arrive at a balance between the interests of the [employee] as citizen, in commenting upon matters of public concern and the interests of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. 1731. "[S]peech concerning matters of public concern occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 914, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); *see also Carey v. Brown*, 447 U.S. 455, 467, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980)). We summarized the *Pickering/Connick* balancing test in *Baldassare v. New Jersey*, 250 F.3d 188 (3d Cir.2001), as follows:

> First, the plaintiff must establish the activity in question was protected. For this purpose, the speech must involve a matter of public concern. Once this threshold is met, plaintiff must demon-strate his interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees. These determinations are questions of law for the court.

*Baldassare*, 250 F.3d at 195 (internal citations and quotation marks omitted).

"A public employee's speech involves a matter of public concern if it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Green v. Phila. Housing Authority*, 105 F.3d 882, 885–86 (3d Cir.1997) (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. 1684). Courts determine whether a matter addresses a public concern by considering the content, form and context of a given statement based upon the record as a whole. *Connick*, 461 U.S. at 148, 103 S.Ct. 1684.

Here, there is little doubt that Johnson's statements to Judge Lisa touched upon a matter of public concern. The discussion in the judge's chambers concerned the court's backlog which presumably affected the speedy trial rights of criminal defendants, and had implications for the operation of the judicial system as well as for how tax dollars were being spent. Thus, the district court correctly concluded that Johnson's discussion with the judge satisfied the first prong of the *Pickering/Connick* inquiry. *See Johnson*, 156 F.Supp. at 434–435 ("Certainly when compared to other speech held to involve

---

tection arguments because they were not raised on appeal.

**3.** We exercise plenary review over the district court's grant of summary judgment. *Baldassare v. New Jersey*, 250 F.3d 188, 192 n.1 (3d Cir.2001). Accordingly, we must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Azzaro v. County*

*of Allegheny*, 110 F.3d 968, 970 (3d Cir.1997) (en banc). We will make an independent constitutional judgment to determine whether the speech involved was constitutionally protected. *Connick v. Myers*, 461 U.S. 138, 150 n.10, 103 S.Ct. 1684, 75 L.Ed.2d 708, (1983); *Watters v. City of Philadelphia*, 55 F.3d 886, 891 (3d Cir.1995).

matters of public concern ... the nature of the comments here, and the context in which they were discussed, strongly support a finding that they implicate public concern.").

■■■ We turn, then, to the second factor under *Pickering*: whether Johnson's speech interest outweighs the countervailing interest of Yurick and the County in promoting the efficiency of the public services it provides through its employees. "Only if the value of the speech, as measured by the employee's and the public's interests, is outweighed by the government's interest in effective and efficient provision of services, will we hold that the speech is unprotected." *Azzaro v. County of Allegheny*, 110 F.3d 968, 980 (3d Cir. 1997) (en banc).

■■■ As noted above, in order to determine if Johnson's speech interest can be subordinated to the interest of the employer, we must assess the context in which Johnson made the statement. "[T]he manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (citing *Connick*, 461 U.S. at 152–153, 103 S.Ct. 1684; *Givhan v. Western Line Consolidated School Dist.*, 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)). Moreover, "[t]he public employer ... bears the burden of justifying the discharge." *Baldassare*, 250 F.3d at 197 (internal quotations and citations omitted). However, this burden "varies depending upon the nature of the employee's expression." *Id.*

■■■ We must also be cognizant of the relationship between the plaintiff/employee, and the defendant/employer, and the extent to which the employee's responsibility to the employer justified the challenged employment decision. Thus, "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151–52, 103 S.Ct. 1684. The public employer's interest in avoiding disruption is enhanced when the employee asserting the right to speak serves in a "confidential, policymaking, or public contact role." *Cf. Rankin*, 483 U.S. at 390–91, 107 S.Ct. 2891. Accordingly, "the crucial variant in the balance appears to [be] the hierarchical proximity of the criticizing employee to the person or body criticized." *Sprague v. Fitzpatrick*, 546 F.2d 560, 564 (3d Cir. 1976).

On Johnson's side of the balance, he contends that he acted squarely within the scope of his duties in having a private meeting with Judge Lisa in his chambers about the backlog of cases which had accumulated on the pretrial and trial lists. Johnson also claims he was under instructions from Yurick to take the steps necessary to resolve the backlog problem. This, he argues, fits within the content and form of speech protected under the First Amendment. *Cf. Connick*, 461 U.S. at 146–147, 103 S.Ct. 1684. On the other hand, Appellees contend that the evidence on the record at summary judgment demonstrates that Johnson's actions breached a relationship of trust between Yurick and his deputy, Johnson, and consequently undermined their working relationship so substantially that Yurick was justified in firing him.

Although it is clear that these facts demonstrate that Johnson spoke to Judge Lisa on a matter of public concern, we note that in so doing, he was not acting as a private citizen, as Johnson himself admits, but in his role as First Assistant Prosecutor and a government employee. In this role, Johnson acted as Yurick's deputy. Johnson was obligated to follow and implement

the policy directives set by Yurick. Yurick had to trust Johnson to carry out his instructions and implement his directives. Johnson served Yurick in "a confidential and policymaking role." *Rankin*, 483 U.S. at 390–91, 107 S.Ct. 2891.

The record shows that Yurick instructed all of his staff that they would maintain the plea bargaining policy. Nonetheless, Johnson spoke to Judge Lisa and had a conversation which was critical of the plea bargaining policy and resulted in the drafting of a proposal that would modify the policy in a way that would conflict with Yurick's public position concerning the policy. Johnson did so without informing Yurick or asking Yurick's permission beforehand. He informed Yurick a week after the fact.

Johnson acted in a way that directly conflicted with his role as Yurick's deputy and subverted the relationship of trust and confidence between Johnson and Yurick. *Rankin*, 483 U.S. at 378, 107 S.Ct. 2891. We believe that this disruption substantially undermined the relationship between Johnson and Yurick. Thus, Yurick's interest as the state employer in avoiding such interference clearly outweighs Johnson's free speech interests. *See id.* ("Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest.").

*Sprague* informs and controls our decision here. There, the District Attorney for Philadelphia made certain public statements about an ongoing case. The next day, the First Assistant District Attorney made statements in a newspaper interview disputing the truthfulness of the District Attorney's statements. The District Attorney fired the First Assistant for these statements. The district court granted summary judgment in favor of the District Attorney. On appeal, this court affirmed. The First Assistant, who was characterized as the District Attorney's alter ego and his chief policy deputy, had a close, confidential working relationship with the District Attorney. *Sprague*, 546 F.2d at 565. We reasoned that the "disruptive impact" of his statement was clearly shown since the First Assistant had declared in public that his superior had not told the truth. We found that this action had so seriously undermined the employer/employee relationship that the balance weighed against First Amendment protection. *Id.*

Johnson and Yurick had a relationship of trust and confidence exactly like that between the District Attorney and his First Assistant in *Sprague*. Additionally, Judge Lisa had publicly criticized Yurick's plea bargaining policy, Yurick and Lisa had publicly sparred over the policy, and Yurick had instructed his staff that they would stick to the policy. Nonetheless, Johnson approached Lisa, Yurick's chief critic on this issue, without Yurick's knowledge or permission. Johnson confided his criticisms about the plea bargaining policy to Judge Lisa. Therefore, notwithstanding the fact that the purported goal of the conversation was to fix the backlog problem, this unauthorized conversation nonetheless had a disruptive impact which undermined the working relationship between Johnson and Yurick.[4]

4. *Sprague* instructs that the disruptive nature of the speech is not the sole controlling factor in these cases. 546 F.2d at 566 (Chief Judge Seitz concurring). The record before us shows that Johnson's conversation with Judge Lisa was not the sole event prompting his termination. Johnson had a number of other policy disagreements with Yurick as well as various disputes with his subordinates in the Prosecutor's Office. Nonetheless, it is clear from the record that Johnson and Yurick's relationship deteriorated after Johnson dis-

We believe this to be correct in spite of the fact that the conversation between Johnson and Judge Lisa took place in private and the criticism by the First Assistant District Attorney in *Sprague* was public. Johnson shared his own criticisms with Yurick's chief critic and subverted Yurick's instructions that the Prosecutor's Office would maintain the policy by proposing a modified policy without Yurick's permission. The apparent hope of Johnson's private communication with Judge Lisa was a public change in the plea bargaining policy which would have controverted Yurick's determination of the issue. This act created "an irreparable breach of confidence between the two men." *Sprague*, 546 F.2d at 565. Such an act would be tantamount to defecting to the opposition, and would understandably undermine the confidence Yurick had in Johnson. Under these circumstances, we believe Johnson's comments to Judge Lisa constituted a "form of public criticism of the superior by the subordinate [which] would seriously undermine the effectiveness of the working relationship between them." *Pickering*, 391 U.S. at 569–70, 88 S.Ct. 1731.

The district court reached this conclusion by noting that "[t]he fact remains that Yurick was furious at what he perceived to be Plaintiff's meeting with Judge Lisa behind his back and without discussing it with him first." *Johnson*, 156 F.Supp.2d at 435. It was Yurick's resulting loss of confidence in Johnson to which the district court ultimately points as the factor tipping the balance in favor of the State's interests as employer. *Id.* ("Yurick's loss of confidence in Plaintiff and sense of betrayal understandably undermined their close working relationship.") We believe the district court was correct in its analysis.

closed his meeting with Judge Lisa. *Johnson,*

In circumstances such as those presented here, senior governmental officials have an interest in not tolerating such dissent among their top advisers. *See Moran v. State of Washington,* 147 F.3d 839, 850 (9th Cir.1998) ("Indeed we are most doubtful that the Constitution ever protects the right of a public employee in a policymaking position to criticize her employer's policies or programs simply because she does not share her employer's legislative or administrative vision."). This is because "[h]igh-level officials must be permitted to accomplish their organizational objectives through key deputies who are loyal, cooperative, willing to carry out their superiors' policies, and perceived by the public as sharing their superiors' aims." *Hall v. Ford,* 856 F.2d 255, 263 (D.C.Cir. 1988).

Given these considerations, Yurick's interest in maintaining the effectiveness of the Prosecutor's office by disciplining insubordinate employees outweighs Johnson's interest in commenting upon matters of public concern. Accordingly, we will affirm the decision of the district court.